Argued and submitted March 2, judgment of Tax Court affirmed October 4, 2001

# PENNZOIL COMPANY AND SUBSIDIARIES,
## *Appellants,*

*v.*

# DEPARTMENT OF REVENUE,
## *Respondent.*

## (OTC 4301; SC S47561)

33 P3d 314

Paul H. Frankel, of Morrison & Foerster LLP, New York, New York, argued the cause for appellants. Carol Vogt Lavine and Timothy R. Volpert, of Davis Wright Tremaine LLP, Portland, filed the briefs for appellants.

Marilyn J. Harbur, Assistant Attorney General, Salem, argued the cause for respondent. With her on the briefs was Hardy Myers, Attorney General.

Before Carson, Chief Justice, and Gillette, Durham, Leeson, Riggs and De Muniz, Justices.**

DE MUNIZ, J.

---

** Balmer, J., did not participate in the consideration or decision of this case.

## DE MUNIZ, J.

The issue in this tax case is whether proceeds that taxpayer Pennzoil Company (Pennzoil) received in settlement of a tort judgment constitute business income under Oregon's tax code and, if so, whether apportionment of that income is constitutionally permissible. The Tax Court held that the proceeds were apportionable business income. *Pennzoil Co. v. Dept. of Rev.*, 15 OTR 101 (2000). For the reasons that follow, we affirm.

The facts are drawn from the parties' stipulations and the Tax Court's findings. In January 1984, Pennzoil agreed to purchase 3/7 of Getty Oil (Getty) stock. In return, Getty agreed to place Pennzoil officers in key positions on the Getty board of directors. The agreement provided that Pennzoil and the Getty Trust would be the sole owners of Getty, holding 3/7 and 4/7 of the company respectively. Another term of the agreement provided for the two shareholders to divide Getty's assets if Pennzoil and the Trust could not agree on a plan to restructure the company; those assets included Getty's substantial and proven oil and gas reserves.

A short time later, Pennzoil was surprised by a public announcement that Texaco had acquired *all* of Getty's stock. Pennzoil first sued Getty for specific performance in Delaware. After losing that action, Pennzoil sued Texaco in Texas for tortious interference with a contract. In that action, Pennzoil claimed damages based on the loss of its bargain with Getty in an amount equal to the cost of finding and developing one billion barrels of oil reserves. A jury awarded Pennzoil more than $11.1 billion, including $3 billion in punitive damages. Texaco filed for Chapter 11 bankruptcy protection and, following a period of negotiation, Pennzoil agreed to accept $3 billion in satisfaction of the outstanding judgment.

Pennzoil received the settlement proceeds under a carefully structured payment plan, initially investing the money in high-grade securities.[1] Pennzoil segregated the

---

[1] Pennzoil eventually used the proceeds to purchase about nine percent of Chevron Oil's common stock. *See Katz v. Chevron Corporation*, 22 Cal App 4th 1352, 1362, 27 Cal Rptr 2d 681 (1994) (shareholder derivative suit challenging

securities from ordinary operating business accounts so that it could avoid classification as an "investment company" under federal securities law and take advantage of a federal tax exemption for income received by "involuntary conversion." The latter strategy was only partially successful. The Internal Revenue Service (IRS) applied the exemption to part of the proceeds, but decided that approximately $2.1 billion was taxable income for 1988. The question here is whether Oregon may apportion, for tax purposes, that $2.1 billion.

Pennzoil's only activity in Oregon during the 1988 tax year was the operation of a facility designed to blend, package, and distribute motor oil and related automotive products. None of Pennzoil's Oregon employees played a role in the Texas litigation or the negotiations that followed. In 1988, and the two years preceding, the Oregon facility operated at a reported loss. Pennzoil's 1988 Oregon tax return treated the settlement proceeds as nonbusiness income. However, the Department of Revenue (department) disagreed and assessed an additional corporate excise tax based on Oregon's share of the $2.1 billion. These proceedings ensued.

The Tax Court held that the proceeds were business income, subject to apportionment under ORS 314.650 (1987),[2] because: (1) the income arose from Pennzoil's agreement with Getty Oil; (2) Pennzoil's purpose in negotiating the Getty contract was to acquire some of Getty's oil reserves; (3) Pennzoil is in the business of acquiring and developing oil and gas reserves; (4) negotiating the contract with Getty was therefore in the regular course of Pennzoil's business; (5) the transaction with Getty was inherently an integral part of Pennzoil's regular business; and (6) income arising from that transaction was apportionable as business income under the Uniform Division of Income for Tax Purposes Act (UDITPA), ORS 314.605 to ORS 314.670 (1987).

---

corporate directors' defensive strategy in dealing with Pennzoil's purchase of 31.5 million shares for $2.1 billion).

[2] ORS 314.650(1) (1987) provided:

"(1) All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three."

Pennzoil challenges the Tax Court's ruling in three assignments of error. First, Pennzoil asserts that the Tax Court erred in determining that the proceeds were "business income." Second, Pennzoil asserts that the Due Process and Commerce Clauses of the United States Constitution prohibit Oregon from taxing the proceeds. Finally, Pennzoil asserts that the Tax Court erred by apportioning the proceeds under ORS 314.670 (1987) in·a manner that grossly and unconstitutionally distorts Pennzoil's activity in Oregon.

■■ We begin with Pennzoil's statutory argument. *See Stelts v. State of Oregon*, 299 Or 252, 257, 701 P2d 1047 (1985) (pertinent statutes are considered before state and federal constitutions). Income earned outside Oregon may be apportioned if it is "business income." However, "nonbusiness income" that is earned elsewhere may not be apportioned.[3] Pennzoil asserts that the proceeds are "nonbusiness income" and, therefore, not subject to apportionment. "Nonbusiness income" is defined as "all income other than business income." ORS 314.610(5) (1987). "Business income" is

"income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, the management, use or rental, and the disposition of the property constitute integral parts of the taxpayer's regular trade or business operations."

ORS 314.610(1) (1987).

Previously, this court has recognized that ORS 314.610(1) has two parts: (1) income derived from "transactions and activity in the regular course of the taxpayer's trade or business[;]" and (2) income derived from property "if the acquisition, the management, use or rental, and the disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." *Willamette Industries, Inc. v. Dept. of Rev.*, 331 Or 311, 316, 15 P3d 18 (2000). Each part involves a separate test: part one requires a "transactional test" and part two requires a "functional test." If the

---

[3] Under UDITPA, "nonbusiness income" is allocated entirely to the state in which it was earned. ORS 314.625 to ORS 314.645 (1987).

income in question satisfies either test, then it may be apportioned as "business income." *Id.*

■■ Under the transactional test, "business income" is "income arising from transactions and activity in the regular course of the taxpayer's trade or business." The first question, therefore, is: What transaction or activity gave rise to the disputed income? *See Hoechst Celanese Corporation v. Franchise Tax Board*, 106 Cal Rptr 2d 548, 563, 22 P3d 324 (2001) (nature of transaction or activity that gave rise to income is critical factor); *Western Natural Gas Co. v. McDonald*, 202 Kan 98, 101, 446 P2d 781 (1968) (same). In addressing that question, we may consider the frequency or regularity of the transaction and how the income created by the transaction is used. *Kemppel v. Zaino*, 91 Ohio St 3d 420, 422, 746 NE2d 1073 (2001); *Hoechst*, 106 Cal Rptr 2d at 563.

Here, the parties do not agree on what transaction or activity gave rise to the settlement proceeds. Pennzoil contends that the settlement proceeds arose from Texaco's tortious interference with the contract between Pennzoil and Getty. The department, however, asserts that the agreement itself gave rise to the proceeds. The Tax Court agreed with the department, concluding that

> "it does not matter whether the contract was sold, stolen, condemned, interfered with, or canceled; the income realized from it by Pennzoil was income *'arising from'* that contract."

15 OTR at 109 (emphasis added).

Pennzoil challenges the Tax Court's decision, arguing that that court ignored several important facts, including: (1) Texaco's agreement to indemnify Getty for any litigation arising out of the earlier deal between Getty and Pennzoil; (2) Texaco's bankruptcy; and (3) Texaco's creditors opposition to Pennzoil's efforts to enforce the judgment. Those facts, Pennzoil contends, illustrate that Texaco's conduct gave rise to the jury award and, ultimately, the settlement proceeds.

For many years, courts determining the tax consequences of income received through litigation or settlement have asked: "In lieu of what were the damages awarded?"

*See, e.g., Raytheon Production Corporation v. Commissioner of Internal Revenue*, 144 F2d 110, 113 (1st Cir 1944) (discussing that recoveries that represent a reimbursement for loss of profits are "income"); *see also Getty v. Commissioner of Internal Revenue*, 913 F2d 1486, 1490 (9th Cir 1990) (maintaining that any accession to wealth received by taxpayer is presumed to be gross income includable in taxpayer's return); *accord Simpson Timber Company v. Dept. of Rev.*, 326 Or 370, 375, 953 P2d 366 (1998) (condemnation proceeds treated as income from voluntary sale of asset held by taxpayer for purpose of producing "business income"). Substantial evidence supports the Tax Court's finding that Pennzoil sought damages against Texaco based on the loss of its contract with Getty. *See* ORS 305.445 (setting out substantial evidence standard of review). We conclude that Pennzoil received the settlement proceeds in lieu of its agreement with Getty and that the agreement gave rise to the disputed income.

■    The second question under the transactional test is: Did the agreement with Getty occur in the "regular course of [Pennzoil's] trade or business?" Again, we may consider the frequency or regularity of the transaction, and how Pennzoil used the resulting income. *Kemppel*, 91 Ohio St 3d at 422, *Hoechst*, 106 Cal Rptr 2d at 563. Pennzoil contends that the agreement with Getty was for stock, a transaction that Pennzoil characterizes as infrequent, irregular, and not in the course of its trade or business.

The department, on the other hand, observes that during Pennzoil's action against Texaco, Pennzoil repeatedly emphasized that the reason for its agreement with Getty was to gain access to Getty's oil reserves. That objective was reflected by a provision requiring Getty's assets to be distributed in the event that the two shareholders could not agree on a plan to restructure the company. Because Pennzoil's purpose was to acquire access to (or possession of) Getty's oil reserves, the department argues, it is reasonable to conclude that Pennzoil made the agreement in the regular course of its business, *i.e.*, extracting, processing, and selling petroleum, natural gas and minerals.

■ The frequency or regularity of a given transaction or activity may be considered but is not determinative of whether that transaction is in the "regular course of the tax-payer's trade or business"; neither is the manner in which the taxpayer spends income created by that transaction. Thus, even if it is rare for Pennzoil to purchase stock in other oil companies—an argument weakened by the fact that Pennzoil used the settlement proceeds to acquire nine percent of Chevron Oil, *Katz*, 22 Cal App 4th at 1362—we are persuaded that steps taken to acquire an interest in established oil reserves are steps taken in the "regular course of [Pennzoil's] trade or business." The Tax Court's finding that Pennzoil sought and received damages from Texaco based on the cost of developing one billion barrels of oil reserves supports that conclusion. We conclude that the proceeds are business income under the transactional test. Accordingly, it is unnecessary to apply the functional test.

■ Having resolved the statutory question, we turn to Pennzoil's second assignment of error. Pennzoil argues that Oregon's apportionment of the proceeds violates limitations imposed under the Due Process and Commerce Clauses of the United State Constitution. Under those clauses, states may tax income that is earned elsewhere only if there is "some definite link, some minimum connection, between [the taxing] state and the person, property or transaction it seeks to tax." *Miller Brothers Co. v. Maryland,* 347 US 340, 344-45, 74 S Ct 535, 98 L Ed 744 (1954). The constitutional parameters for taxing nondomiciliary corporations are defined by the unitary business principle that permits states to "tax a corporation on an apportionable share of the multistate business carried on in part in the taxing State." *Allied Signal, Inc. v. Director, Division of Taxation,* 504 US 768, 778, 112 S Ct 2251, 119 L Ed 2d 533 (1992).

■ The unitary business principle supports a basis for apportionment. Specifically, states may apportion capital transactions that serve an operational function. *Allied Signal,* 504 US at 787. Taxpayers challenging apportionment must prove that "the income was earned in the course of activities unrelated to [those carried out in the taxing] State." *Id.* (quoting *Mobile Oil Corp. v. Commissioner of Taxes*

*of Vt.*, 445 US 425, 439, 100 S Ct 1223, 63 L Ed 2d 510 (1980) (brackets in original)).

Pennzoil argues that its unitary business was unaffected by the agreement with Getty or by Texaco's interference with the agreement and that the disputed income has no role in Pennzoil's Oregon operations. We are not persuaded. As already explained, the agreement between Pennzoil and Getty generated $2.1 billion of income that Texaco paid in lieu of Pennzoil's right to acquire an interest in Getty's oil reserves. The acquisition of oil reserves is related—indeed is vitally important—to the continued blending and distribution of motor oil in Oregon. *See Corn Products Refining Co. v. Commissioner*, 350 US 46, 50, 76 S Ct 20, 100 L Ed 29 (1955) (taxpayer's purchase of corn futures to insure adequate supply of raw material was "vitally important to the company's business"). Pennzoil has failed to meet its burden. The disputed income arose from activity that serves an operational function and, therefore, Oregon may apportion that income.

■ Pennzoil's third and final assignment of error asserts that its 1988 assessed tax liability in Oregon is unconstitutional because it is out of proportion with the amount of business it actually did in the state. Pennzoil argues that formulary apportionment of the proceeds is *per se* unconstitutional, because it results in a tax liability that is approximately 844% larger than it would have been under a separate accounting method.[4] As we understand Pennzoil's argument, Oregon must sever large capital transactions from unitary business income, because state apportionment of business income is limited to business income generated within the

---

[4] In support of its argument, Pennzoil relies on *Hans Rees' Sons v. North Carolina ex rel Maxwell*, 283 US 123, 51 S Ct 385, 75 L Ed 879 (1931), in which the Supreme Court held that, although the taxpayer's business was unitary, the statutory apportionment method operated "unreasonably and arbitrarily," because it attributed to the taxing state "a percentage of income out of all appropriate proportion to business transacted" in the state. *Id.* at 135.

Modernly, *Hans Rees'* is of limited value because Oregon, like the majority of states, has a multi factor apportionment formula and, so far, the Court has refused to test the application of a multi factor apportionment formula to a unitary multistate business by the principles of separate accounting. *See Development in the Law—Federal Limitations on State Taxation of Interstate Business*, 75 Harv L Rev 955, 1015 (1962) (discussing judicial treatment of apportionment formulas).

state. In other words, Pennzoil argues that the unitary business principle does not apply to large capital transactions.

Our answer to Pennzoil's argument mirrors the Tax Court's. First, we disapprove of the separate accounting method that Pennzoil advocates. Indeed, the difficulty in applying a separate accounting method to a multistate business is the very reason for apportionment and the unitary business principle. Second, if Oregon could sever a single capital transaction from unitary business income simply because apportionment of that income would result in distortion, then there would be little point in maintaining the unitary business principle. Pennzoil's unitary business succeeded in 1988 largely because of the settlement proceeds received from Texaco. In 1988, Pennzoil conducted part of its unitary business in Oregon. As a result, Oregon is entitled to apportion the settlement proceeds as unitary business income.

The judgment of the Tax Court is affirmed.