ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
 I. INTRODUCTION
This case is before the court on Plaintiffs' Motion for Summary Judgment or Partial Summary Adjudication of Issues and Defendant Department's Cross-Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment or Partial Summary Adjudication of Issues. This is the second round of such motions in this case. The first round was the subject of the court's Opinion inCrystal Communications, Inc. v. Department of Revenue, TC No 4769, WL 5182047 (Dec 10, 2008)(Crystal I).
 II. FACTS
The facts relevant to this order are, for the most part, stated in the prior opinion of this court. They include the facts relating to the acquisition and development of the FCC license.[1] *Page 2 
The FCC license was, by far, the most important and valuable asset for the company and its shareholders. The FCC license only permitted operations within a limited number of counties in northwestern Oregon. The FCC license made possible development of a customer base within Oregon — development that occurred as a result of efforts of an employee of Crystal and contract partners.
In addition to the facts summarized in the earlier opinion, the record reveals that the market value of the FCC license was a function of how many customers had been developed for the area covered by the license. (Stip Facts at 10, ¶ 18.) Taxpayers engaged in no other activities other than those associated with the development, operation, and disposition of the FCC license and related assets.
 III. ISSUE
The first issue presented for decision is whether the gain from the disposition of the FCC license was business income or nonbusiness income for purposes of applying the apportionment and allocation provisions of ORS 314.280.
Assuming the income produced was business income, the second issue presented by the parties is what are the income-producing activities associated with the gain on disposition of the FCC license, and particularly are those income producing activities limited to activities undertaken by the employee of Crystal in negotiating for and completing the transaction by which the FCC license was sold?
 IV. ANALYSIS
The proper resolution of the current round of this income tax case involves consideration of ORS 314.280, ORS 314.605 to 314.675 (Oregon Uniform Division of Income for Tax Purposes Act (Oregon UDITPA)), and the rules promulgated by the department under such *Page 3 
statutes — all potential sources of authority addressing the question of apportionment and allocation of income for corporations and nonresident individuals.[2] As the legislative development and administrative interpretation of those statutes is of importance, a review of the historical development of Oregon law on apportionment and allocation of income follows.[3] That review can be divided between the period before the adoption of Oregon UDITPA in 1965 (the "pre-UDITPA period") and the period following 1965 (the "UDITPA period").
A. The Pre-UDITPA Period
This period begins with the adoption of personal and corporate net income tax statutes in 1929. Or Laws 1929, ch448 (corporate income); Or Laws 1929, ch 427 (personal income). From 1929 to 1965, the statutory principles of apportionment that applied to corporations and nonresident individuals were essentially stable and, as of 1957, may be described as follows:
 (1) There was only one statutory apportionment provision, and this was located in ORS 314.280 or its predecessors.[4] No separate statutory treatment for utilities and financial institutions existed.
 (2) As with ORS 314.280, in effect for the years in question here:
 (a) The provisions applied when a taxpayer had income from business done within and without the state; *Page 4 
 (b) The determination of net income assigned to Oregon was to be based upon business done within the state;
 (c) The department could permit or require segregated reporting or the apportionment method of reporting;
 (d) All methods were to be governed by rules of the department designed to fairly and accurately reflect the net income of the business done within the state;
 (e) There was no indication in the statute that the definition of business done within the state and associated income was anything short of the federal statutory and constitutional limits generally applicable; and
 (f) Alternative bases for apportionment could be used if approved by the department.
The "legislative" rules that the department promulgated under ORS 314.280 remained basically stable from 1929 to 1965 and, as of 1965, had the following features.[5]
 (1) They applied to taxpayers who carried on business or activity both within and without the state.
 (2) The dichotomy recognized in the rules with respect to apportionment was not, as it is today, between business income and nonbusiness income, but rather between when the apportionment method was appropriate and when the segregated accounting method was appropriate.
 (3) The segregated accounting method was appropriate only when the business or activity could not be classed as unitary. The rules recognized that "[i]n most cases the circumstances are such that income arising from the business done in Oregon must be determined by the apportionment method." Reg 314.280(1)-(B) (1964). *Page 5 
 (4) The rules contained no indication that there existed any limitation on the department's decision on apportionment or segregation or the terms of apportionment, other than the statutory standards of fair and accurate apportionment. Implicitly, any method violating federal statutes or constitutional restraints could not be applied.
 (5) The apportionment method was to be applied when the business within and without the state was unitary. A business was unitary when it was a business "the component parts of which are too closely connected and necessary to each other to justify division or separate consideration as independent units." Reg. 314.280(1)-(B) (1964)
 (6) As stated above, rather than employing the terms "business income" and "nonbusiness income," the rules distinguished between apportionment and segregation. Consistent with this, the rules defined "apportionment income," and as to that concept, provided in Regulation 314.280(1)-(B) (1964):
 (a) Income from property that was not part of or connected with the unitary business was excluded from apportionment income.
 (b) Income from intangible property that was not part of or connected with the unitary business was assigned to the domicile of the taxpayer. Income from rent or sale of tangible assets not used in the conduct of business was allocated to the state of location of the property.
 (c) Income from tangible or intangible property that was part of or connected with the unitary business constituted apportionment income.[6]
 (d) Even in cases where segregated accounting was justified, income from the conduct of business in Oregon — operating income — had to be determined. Reg. 314.280(1)-(C) (1964). Here, gains on the sale of real and tangible personal property utilized in the business were required to be included in the measure of the tax. Similar treatment was afforded to nonoperating income from sources arising within the state.
 (e) Income and gain associated with intangible property of a taxpayer was treated as follows: *Page 6 
 (i) Where apportionment was used — that is, where the asset was a part of or connected with a unitary business — then the income and gain was included in apportionable base. Reg. 314.280(1)-(B) (1964);
 (ii) If segregated accounting was used, and the taxpayer was domiciled in Oregon, all income and gain from intangible property not used in the business was includable in Oregon income. Reg. 314.280(1)-(B) (1964); and
 (iii) If the segregated method was used, and the taxpayer was not domiciled in Oregon, income from, and gain on disposition of, intangibles was subject to tax in Oregon if and to the extent that the property had a situs for taxation in Oregon. Situs existed if the intangible was employed as a capital or current asset of the business within Oregon. Reg. 314.280(1)-(C) (1964).
It follows that on the eve of the adoption of Oregon UDITPA, the gain on the sale of the FCC license would unquestionably have been subjected to taxation in Oregon on an apportioned basis. The FCC license would obviously and undeniably have been considered "a part of or connected with the unitary business" and therefore, as described in factor (e)(i) above, would have been income subject to apportionment. See Reg. 314.280(1)-(B) (1964). Even if the segregated method of accounting had been applicable, the FCC license would have been viewed as employed as a capital or current asset within Oregon — indeed, that is the only location in which it could have been employed. As stated in factor (e)(iii) above, it would have been subject to Oregon tax under Regulation 314.280(1)-(C) (1964). The fact that the income from the asset was from a liquidating disposition would have been irrelevant.
Such a result would have been fully consistent with the underlying principles of the then applicable Oregon law — to subject to taxation income from whatever source derived, subject only to limitations imposed by Oregon statute or federal law. For individuals, that scope of inclusion of income was found in the provisions of ORS 316.125 (1963), ORS 316.105 (1963), *Page 7 
ORS 316.015 (1963), and related rules. Those statutes and rules subjected to tax as gross income, income from anysource, except as specifically exempted by law. Reg. 316.105(1)-(A) (1964). Specific exemptions were addressed in Regulation 316.110 (1964). Those included exemptions granted by statute and "those items of income exempted by federal constitutional law." ORS 316.110 (1963); ORS 316.305 (1963); Reg. 316.110 (1964).[7]
For corporations, ORS 317.105 (1963) similarly stated the broadest definition of gross income as being income from any source. Although there was not an explicit provision acknowledging exemption based on constitutional limitations similar to that in Regulation 316.110 (1964), Regulation 317.000 (1964) made provisions of the personal tax regulations, such as Regulation 316.110 (1964), applicable to parallel sections of the corporate rules. Of course, even without such recognition, the federal constitutional limitations would have applied. And, except for Oregon statutory exclusions or exemptions, nothing indicated a legislative intent to subject to taxation less than was allowed under the federal constitution in the case of business operations in Oregon.
As to the constitutional limitations on the fiscal reach of Oregon law, the federal constitutional limits had been interpreted as allowing Oregon to subject to taxation income from, or gain attributable to, assets used in or connected to a business operated in Oregon, subject to proper apportionment. See HinesLumber Co. v. State Tax Comm'n.215 Or 453, 469, 336 P2d 75 (1959). Of course income from assets wholly unconnected to business operations in Oregon could not be subjected to tax in Oregon. See Fargo v. Hart,193 US 490, 500, 24 S Ct 498, 48 L Ed 761 (1904). *Page 8 
But income or gain from "connected" assets could be subjected to tax, and nothing in ORS 314.280 (1963) and the implementing rules suggested an intent not to subject such income and gain to tax, at least on an apportioned basis. Indeed, the purpose of ORS 314.280 (1963) and the implementing rules was to provide the apportionment.
To summarize, on the eve of the adoption of Oregon UDITPA, the gain in question here would have been considered income from an asset connected to and part of a unitary business carried on in Oregon. As such, the gain would have been subject to tax in Oregon on an apportioned basis as determined under ORS 314.280 (1963).
B. The UDITPA Period — ORS 314.280
The question then becomes what, if any, change in analysis or result is required or justified by the adoption of Oregon UDITPA? To that question, the court now turns.
To begin with, the adoption of Oregon UDITPA did not repeal, or alter in any material way, the apportionment provisions of ORS 314.280. See Or Laws, 1965, ch 152, § 22. Certain taxpayers were excluded from the coverage of ORS 314.280. However, that statute remained effective for certain taxpayers, including, as the parties have agreed, those present in this case. (Ptfs' Ltr, Mar 3, 2009.) For such taxpayers, nothing in the reach of the tax imposition statutes and ORS 314.280 — to constitutional boundaries subject only to exclusion or exemption by an act of the Oregon legislature — was changed. There was no change in the basic statutory goals of ORS 314.280 — fair and accurate reflection of net income of business done within this state based on business activity in the state. Nor was there a change to the delegation made to the department to govern, by rule, fair and accurate reflection of business done within the state. The question therefore becomes, how are such department rules, including the one relevant here, OAR 150-314.610 (1999), to be construed? *Page 9 
The post-UDITPA rules of the department under ORS 314.280 and applicable in this case operate generally by incorporation.[8]See OAR 150-314.280-(A) to-(F). They incorporate provisions of Oregon UDITPA and the rules the department promulgated under Oregon UDITPA. However, in applying any material incorporated into the ORS 314.280 rules of the department, both the validity of any such incorporation and the construction of any incorporated material must be decided in light of the provisions of ORS 314.280 and not by reference to the provisions of Oregon UDITPA or, absent specific legislative direction otherwise, other statutes. This conclusion is dictated by the decision of our Supreme Court in FisherBroadcasting, Inc. v. Department of Revenue,321 Or 341, 898 P2d 1333 (1995) (Fisher). In Fisher, the court concluded that the policies and standards of ORS 314.280 were sufficiently different from those of Oregon UDITPA that incorporation of standards and principles from Oregon UDITPA and related rules could not be done if that incorporation conflicted with ORS 314.280 policies and standards. Id. at 359. In particular, the Fisher court noted that ORS 314.280 looked tofair and accurate reflection of net income whereas Oregon UDITPA looked to fair representation of business activity andpromotion of uniformity of tax reporting among UDITPA jurisdictions. Id. at 355-56.
In applying the teaching of Fisher, it does not matter that the language incorporated into the department rules under ORS 314.280 comes from other statutes as opposed to other department rules. The reference in OAR 150-314.280-(B) to ORS 314.610 stands no better than the reference to related rules under ORS 314.610. The language referred to must be measured *Page 10 
against ORS 314.280 standards. See Fisher, 321 Or at 358-59. Were it otherwise, the department could avoid the teaching ofFisher too easily — it could simply refer to statutes inconsistent with ORS 314.280 and thereby avoid the principle of ORS 314.280. Id.
The question becomes whether, following the adoption of UDITPA, the incorporation of language from ORS 314.610 and OAR 150-314.610(1)-(B) should be construed as changing in any way the results that would have been obtained under the rules in effect on the eve of the adoption of UDITPA. In short, is OAR 150-314.610(1)-(B) properly construed underORS 314.280 as making the gain present in this case subject to tax, on an apportioned basis, as it would have been subject before 1965, or does that language work a different result?
The answer to the foregoing question is not difficult. OAR 150-314.610(1)-(B)(2) states:
 "Gain or loss from the sale, exchange or other disposition of real or tangible or intangible personal property constitutes business income if the property while owned by the taxpayer was used in the taxpayer's trade or business."
(Emphasis added). The "was used in" test of the rule defining "business income" is essentially no different from the "part of or connected with a unitary business" test that had been the rule prior to 1965 under Regulation 314.280(1)-(B) (1964) in defining "apportionment income." Further, as mentioned above, little change occurred in 1965 to ORS 314.280.[9] There is therefore no statutory reason why the language of OAR 150-314.610(1)-(B) on sale of assets should not be given full effect under ORS 314.280. *Page 11 
Nor is there any indication that the department, in promulgating its rules under ORS 314.280 and referring in those rules to OAR 150-314.610(1)-(B), intended to depart from the positions it had articulated in the pre-Oregon UDITPA period in its "legislative" rules.
The court concludes that the department had the authority to, and did, properly incorporate, for use under ORS 314.280, the language from OAR 150-314.610(1)-(B), making gain on sale of assets used in a business subject to apportioned taxation without regard to whether the gain was produced in a liquidation of the business. Such a result is not a violation of the fair and equitable standard of ORS 314.280. The asset producing the gain in question was a sinequa non of the business in question. Its value was enhanced by the operations of the taxpayers. It would have been part of "apportionment income" prior to 1965. In the post-1965 lexicon, the gain is "business income."
To construe the provisions of OAR 314.610(1)-(B), underORS 314.280 principles, in any other way would be to work a radical change in taxation of persons subject to ORS 314.280 when no statutory or other authority exists for such a conclusion.
The assessment of the department was proper.
C. ORS 314.610 Considered Separately
Taxpayers have argued that principles of Oregon UDITPA should be used in construing OAR 150-314.610(1)-(B) even when it is being applied by incorporation under ORS 314.280. As stated above, the court rejects this methodology, but, for the reasons that follow, no different outcome would occur in any event. In construing OAR 150-314.610(1)-(B) against, or in the context of, only ORS 314.610, it is appropriate to consider:
 (1) Whether a "functional test" as well as a "transactional test" exists under ORS 314.610; *Page 12 
 (2) Whether any "functional test" includes in business income the gain from disposition of assets that were used in a business or only gain from dispositions occurring in the "regular" course of business;
 (3) The case law developments in Oregon under ORS 314.610;
 (4) Whether gain from business asset dispositions is "business income" even when the disposition is one made in liquidation; and
 (5) Certain additional considerations.
1. Separate Functional Test
The existence, under ORS 314.610, of a "functional test" separate from the so-called "transactional test" has been definitively settled by our Supreme Court. In Pennzoil Co. and Subsidiaries v.Department of Revenue (Pennzoil), the Supreme Court stated: "[T]his court has recognized that ORS 314.610(1) has two parts * * *. Each part involves a separate test: part one requires a `transactional test' and part two requires a `functional test.'"332 Or 542, 546, 33 P3d 314 (2001), cert den.535 US 927, 122 S Ct 1297, 152 L Ed 210 (2002) (quotingWillamette Industries, Inc. v. Dept. of Rev.,331 Or 311, 316, 15 P3d 18 (2000) (Willamette Industries) andSimpson Timber Company v. Dept. of Rev.,326 Or 370, 374, 953 P2d 366 (1998) (Simpson)).
2. Inclusion of Asset Sale Gain in Business Income
Does the functional test of "business income" include gain on any sale of business related assets or only sales that are a "regular" part of a business? The focus of this analysis is on the statutory phrase "and includes income from tangible and intangible property if the acquisition, the management, use or rental, and the disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." ORS 314.610(1). There is no question that the assets in question here were acquired, managed, and used as integral parts of taxpayers' business. For the gain on the assets to be business income, must the disposition be an integral part of taxpayers' regular business operations, and was it? The analysis here will address (a) the need *Page 13 
for a separate role for this functional test, (b) the concept of property that is integral to business operations, and (c) the scope of change effected by the adoption of Oregon UDITPA.
The parties have nicely set out what have become the widely articulated arguments both as to the existence of a separate functional test under ORS 314.610(1) and whether or when gain from dispositions of assets used in a business are business income. Those arguments are set out in the briefs and are also found in Jerome R. Hellerstein and Walter Hellerstein, 1 StateTaxation ¶ 9.05 (3d ed 2010).
Those arguments focus on how to read the language in ORS 314.610 that contains the functional test — especially the word "and" in the phrase "if the acquisition, the management, use or rental, and the disposition of the property constitute integral parts of the taxpayer's regular trade or business[.]" Particularly, in the case of gain from a disposition of property, must the taxpayer be in a business that regularly disposes of the type of property in question, or is it sufficient that the property was an integral part of the trade or business at the time of its disposition?
Suffice it to say that the courts of other states are split on this issue. Some read the "and" in a mandatory conjunctive fashion and consider occasional sales of property used in a business as nonbusiness income. See Pennzoil, 332 Or at 547 (citing with approval Hoechst Celanese Corp. v. Franchise Tax Bd.,25 Cal 4th 508, 22 P3d 324, cert den,534 US 1040, 122 S Ct 614, 151 L Ed 537 (2001)). The highest court of California, a state bearing an important relationship to the development of the law of unitary taxation and on whose courts Oregon courts have often relied, finds the functional test to exist and to apply to dispositions of property used in a business. SeeHoechst Celanese Corp., 22 P3d at 332, 334. *Page 14 
Taxpayers here maintain that for gain on disposition to be business income under the functional test, the disposition must have been a regular part of the business of the taxpayer. This court is of the view that because the Oregon Supreme Court has recognized the existence of a functional test, the position of taxpayers must be rejected. See Pennzoil, 332 Or at 546.
Taxpayers' construction has the effect of rendering the functional test, recognized by our Supreme Court as an independent test, as completely redundant or duplicative of the "transactional test." If each of the acts of "acquisition," "management," "use" or "rental," and "disposition" must be regularly undertaken in connection with any given asset, those activities will necessarily also, in all cases, constitute "transactions * * * in the regular course of the taxpayers' trade or business," and therefore be covered by the "transactional test." See ORS 314.610(1); Pennzoil,332 Or at 547.
Further, under taxpayers' construction, sale of property clearly integral to unitary business operations would, for the first time with the adoption of Oregon UDITPA, have been placed outside the reach of the Oregon tax system when the owner of the asset was a nonresident or foreign corporation or when the property was real or tangible personal property located outside Oregon. Gain or property that constituted an integral part of a unitary business would be excluded from business income because of the nature of the disposition rather than the relationship of the asset to the business.
That exclusion would be a dramatic departure from the pre-1965 rule that Oregon's tax reach under apportionment principles extended to the federal constitutional boundaries. *Page 15 
Recall that under Fargo, the United States Supreme Court restricted the reach of the unitary principle, but it recognized that a state where an asset is used in business has a claim to tax when the asset is connected to — integral to — the business. 193 US at 499-500. That principle focuses on the asset and not on the context of its disposition. See id.
There is no indication that anyone believed such major changes in apportionment had been effected by the adoption of Oregon UDITPA. Representative James A. Redden said so in the debate on the floor of the House of Representatives:
 "The natural question is what will happen if we enact this bill and other states do not because unless or until all states enact this, of course it cannot be uniform in its application, and we will be in the vanguard of states which do enact this legislation. This was something that we went into in depth, and the changes that will be made in Oregon are very insignificant and almost nonexistent. So it really makes no difference to the corporate taxpayer in the state of Oregon whether we have this uniform act or whether we apply our present law because they are virtually the same."
Testimony, House Floor Debate, HB 1003, Feb 16, 1965, Tape 7, Side 2 (statement of Rep James Redden).
Further, our Supreme Court reached a similar conclusion inSperry and Hutchinson v. Department of Revenue,270 Or 329, 527 P2d 729 (1974) (S H). There, speaking about a corporation that was subject to ORS 314.280 before 1965 and subject to Oregon UDITPA after 1965, the court stated:
 "The income from S H's long-term investments are not apportionable to Oregon because neither the capital invested nor the income derived therefrom are a part of the trading stamp business conducted in this state. This is equally true both under the current Uniform Division of Income for Tax Purposes Act (ORS 314.605 to 314.670) which became effective beginning 1965 and under the pre-existing statute (ORS 314.280). Both statutes impose a tax on an interstate corporation only as to income attributable to Oregon and do so through minor variations on the concept of `unitary business.'" *Page 16 
S H, 270 Or at 331-32 (emphasis added, footnote omitted). The court in S H in places wrote as if it was construing the transactional test — is the income or gain from transactions arising in the regular course of business? See id. at 331-34. However, the quoted language shows the court was concerned with the relationship of the asset to the business.
It is simply not possible to read this contemporaneous judicial analysis and the comments of Representative Redden with meaning and yet also conclude that the intent of the legislature in adoption of Oregon UDITPA was to, for the first time, exclude major items of income from apportionable income by means of the definition of "business income." For all of the foregoing reasons, the court concludes that one sale of an asset that has been an integral part of a business constitutes "business" income under ORS 314.610.
3. Case Law
The existing case law neither requires nor supports a different conclusion as to how to read the elements of the functional test. As already mentioned, S H was decided just after the adoption of Oregon UDITPA and addressed tax years both before and after the enactment of Oregon UDITPA. 270 Or at 332-33. The question was the apportionability of income from three different groups of intangibles: long-term investments, short-term investments held pending developments in the market for other long-term investments, and short-term investments held to satisfy working capital needs of the trading stamp business of the taxpayer. See id. at 331.
As to all investments and all years at issue, the court examined whether the investment or earnings were "part of the trading stamp business." Id. at 332. Although the court looked at the statutory language that contains the "transactional test," the opinion begins with the language quoted above and ends with the observation that income will not be apportionable if the taxpayer *Page 17 
shows the intangibles "were not used in or held for use in its trading stamp business." Id. at 334. If a test of "part of the business" or a test of "used in or held for use in the business" is applied to taxpayers in this case, the gain from sale of the license is clearly apportionable business income.
In Simpson, the question was whether interest on a condemnation award was apportionable income.[10] 326 Or at 372-73. The condemnation was of timber and land owned by the taxpayer, a wood products company. Id. The court looked at the assets condemned, timberland and timber, and observed that these assets were "acquired and used" as integral parts of the business.Id. at 376. The court observed that the condemnation disposition "was as much an integral part of the taxpayer's regular business operations for purposes of the statutory definition as were the initial acquisition, management, and use of the timberland."Id. at 377.[11] The observation was made even though the record showed that the taxpayer did not engage in sales of timberland (or land) as part of its business and in fact, had never before sold timber or timberland. See id. at 373.
Although Justice Durham, in concurrence, concluded that the disposition element of the functional test requires that disposition of an asset also be integral to the business, the majority opinion did not require that the disposition of an asset acquired and used in business be a regular occurrence. See Simpson,326 Or at 376-77, 378-82 (Durham, J., concurring). *Page 18 
Simpson supports the conclusion, reflected in OAR 150-314.665(4), that gain on disposition of assets that have been acquired and managed as an integral part of a trade or business is business income. See id. at 376-77.
Willamette Industries, the next case of relevance, does not purport to depart from the analysis of the functional test described in Simpson. See 331 Or at 318. Describing its actions inSimpson regarding the fundamental test, the WillametteIndustries court quoted the following language fromSimpson:
 "`The ultimate source of the income here was the standing timber and the land on which it was growing, assets admittedly acquired and used in taxpayer's business as integral parts of it. The disposition was of those business assets.
 "`We conclude that, when the timber and land on which it was growing were disposed of * * *, that disposition was as much an integral part of the taxpayer's regular business operations for purposes of the statutory definition as were the initial acquisition, management, and use of the timberland.'"
 Id. (quoting Simpson,326 Or at 376-77 (emphasis added)). Throughout the opinion in Willamette Industries, the court also showed that, as to the functional test, it was focused on the word "integral," placing emphasis on that word in its quote of ORS 314.610. Seeid. at 314-16. This shows the court was concerned with the department's rule OAR 150-314.610(1)-(B)(1) that rents and royalties are business income if the property producing the income is incidental to the business.See id.
In rejecting the department's rule and arguments regarding property incidentally related to a business, the court insisted on the statutory requirement that property be integrally related to a business if income or gain therefrom is to be business income.Id. at 315-16. The court recognized that the functional test uses a conjunctive phrase, quoting the statute with emphasis added as: "acquisition, management, use or rental, and disposition of the property." Id. at 316 *Page 19 
(emphasis added). However, when it came to applying that test, the focus of the court returned to the relationship of the asset to the business. Id. at 318-19. The court, focusing on the disposition of minerals giving rise to the royalties said:
 "Even if we view the minerals alone as the property, we reach the same result. In Simpson Timber, the government taking was a compelled disposition of the land and, especially, the timber. The department levied a tax on the interest income associated with the forced disposition. Here, taxpayers disposed of minerals, and the department seeks to tax the royalty income associated with the minerals. The acquisition, management, use or rental, and disposition of the minerals were not an integral part of taxpayers' regular business operations. Trading in minerals was not an integral part of the business of manufacturing forest products. The evidence shows that it is not essential to taxpayers' business that taxpayers own the underlying mineral rights to their timber lands. Thus, the acquisition, management, use or rental, and disposition of the minerals were not integral to taxpayers' regular business operations of harvesting timber and making forest products. Taxpayers' royalty income, therefore, is not taxable as business income in Oregon."
 Id. at 319. The foregoing shows that where, as here, there is a disposition, the business income inquiry will focus on the relationship of the asset disposed of to the business of the taxpayer.
The conclusion reached in Willamette Industries is consistent with OAR 150-314.665(4). The taxpayer in WillametteIndustries was a forest products company. See 331 Or at 313. Under certain of its timberlands, it held oil and gas rights.Id. Disposition of those rights was made in consideration of royalty payments. Id. The question was whether the oil and gas royalties were business income. Id. The taxpayer was not an oil and gas firm. Id. It had oil and gas interests underlying its timberlands because of the coincidence of property rules and not because those interests were integral to the wood products business carried on in Oregon. See id. at 313, 318. Further, the oil and gas interests were located outside of Oregon. Id. at 313. Accordingly, those interests were not used in, much less integral to, the wood products business. Id. at 318. *Page 20 
The importance of these facts is found or reflected in the court's statement in Willamette Industries that:
 "The acquisition, management, use or rental, and disposition of the minerals were not an integral part of the taxpayers' regular business operations. Trading in minerals was not an integral part of the business of manufacturing forest products. The evidence shows that it is not essential to taxpayers' business that taxpayers own the underlying mineral rights to their timber lands. Thus, the acquisition, management, use or rental, and disposition of the minerals were not integral to taxpayers' regular business operations."
 331 Or at 319 (emphasis added). The disposition of minerals was certainly regular forWillamette Industries. It occurred regularly, as oil and gas was recovered, and produced royalty income as disposition of minerals occurred. But something more was needed. That was a relationship of the minerals to the "regular business operations of harvesting timber."Id. (Emphasis added).
The logic of Simpson and Willamette Industries, taken together, is clear:
 (1) Any disposition of an asset integral to the business of the taxpayer satisfies the functional test. That is what occurred in Simpson. 326 Or at 376-77. Timberland was integral to Simpson's business and that sufficed for the functional test, even though the disposition in question had never occurred before. Id.
 (2)Regular dispositions of property acquired and managed will not be sufficient for the functional test if the ownership of the asset disposed of is not essential (integral) to the taxpayer's business. Willamette Industries says that directly. 331 Or at 319.[12]
Taking this language from Simpson, quoted with favor by the court in Willamette Industries and by paraphrasing and substituting the words "FCC license" for the words "timber and land," the result is as follows: *Page 21 
 "`The ultimate source of the income here was the [FCC license], an asset admittedly acquired and used in taxpayers' business as an integral part of it. The disposition was of that asset. We conclude that when the [FCC license] was disposed of, that disposition was as much an integral part of the taxpayers' regular business operations for purposes of the statutory definition as were the initial acquisition, management, and use of the [FCC license].'"
See Willamette Industries,331 Or at 318 (quoting Simpson, 326 Or at 376-77) (emphasis in original omitted). This exercise demonstrates that under bothSimpson and Willamette Industries, the functional test is satisfied as to gain from the disposition of the FCC license.
4. Liquidation Sales
If regular dispositions do not need to be present to satisfy the functional test, as shown by Simpson, the question becomes whether there is any reason the functional test cannot be met when a disposition of an asset constituting an integral part of a business is one made at the conclusion of a particular taxpayer's business use of the asset. It bears remembering that the subject of the disposition in this case is an asset that is not only integral, butessential, to the business. The asset is even more business-related than the one of many stands of timber disposed of in Simpson. It also bears remembering that the record here discloses that taxpayers had clear expectations of harvesting gain from business operations by disposing of the assets to a third party. (Stip Facts at 9-10, ¶¶ 16, 18.)
None of S H, Simpson, or Willamette Industries
answer this question as none involved liquidation sales. However, each of these cases places more importance on the relationship of the asset to the business than on facts of the disposition. Under that approach, the answer is clearly that the functional test is satisfied.
No Oregon case addresses the liquidation sale issue, but the case law consistently addresses the relationship of the asset to the business, and particularly as to the relationship to *Page 22 
business conducted in Oregon. See e.g., Simpson,326 Or at 376-77. It must be remembered that this relationship is tested for the purpose of determining if income from the asset will be apportioned. The foregoing being true, the history of Oregon's apportionment statutes is particularly important. The statutory rule prior to adoption of Oregon UDITPA clearly included income from all sales of business-related assets. See
Reg. 314.280(1)-(B) (1964). This was a piece of an overall statutory scheme and purpose of subjecting to taxation in Oregon all income that Oregon could constitutionally reach. There being no indication that the legislature intended a radical break from the past with respect to liquidation sales, all sales of assets integral to the business should be considered to produce business income. Nothing inS H, Simpson, or Willamette Industries prevents that, and much in the reasoning of those decisions supports just this result.
Considering the separate existence of a functional test, the need for a meaningful role for such a test, and the indication that the legislature intended no radical shift in apportionment rules when it adopted Oregon UDITPA, the taxpayers' construction of ORS 314.610(1) must be rejected. OAR 314.610(1)-(B), to the extent it is directly applicable to this case, is valid and leads to the conclusion that regular sales of property such as the license are not needed in order for gain from any given sale to be treated as apportionable business income where the asset was an integral part of the business.
5(a). Additional Considerations — Amortization or Other CostRecovery
The foregoing conclusion is supported by certain additional points. First, a construction of the department's rules that did not include gain from disposition of the FCC license in "business income" would create a fundamentally illogical and inequitable result. First, consider that the sale of business assets often involves, and obviously involved here, the sale of the future *Page 23 
capacity of the asset to produce income, alone or in conjunction with the use of other assets. The license was continued in use by the buyer. Indeed, the pricing of business assets almost always reflects to some extent the present value of future income. In this case, the record shows the price of the asset was a function of the extent to which it had produced regular business contacts and revenue to the seller. In recognition of just this fact, federal and Oregon law permits depreciation of many assets and amortization of others, including amortization of assets such as the license.See ORS 314.011; IRC § 197.[13] These cost recovery deductions are computed based on the price paid for the asset. IRC § 197. The amount paid can produce both gain to a seller and future deductions for a purchaser.
Now consider the tax treatment of the asset sold in the hands of a "nonresident" purchaser of a license of the type involved here. That purchaser may claim amortization deductions calculated on the full purchase price of the license, including any amount of price associated with gain produced for the seller.[14] Such deductions will serve to reduce the Oregon taxable business income of the purchaser from the use of the license in Oregon.[15] Therefore, the future income inherent in the business asset sold and actually realized by the purchaser through operations will, up to the amount of the price paid, never be reflected in the Oregon taxable business income of the purchaser. That price paid will shelter income and gain. However, if the disposition, by either the original owner or the purchaser of the amortized license at a gain does *Page 24 
not yield business taxable gain, Oregon will have permitted business deductions without any reckoning for the gain that those deductions engendered by way of reductions in the tax basis of the license. This result would repeat itself with each sale of the license and operation of the license by the purchaser. Could the Oregon legislature, in the adoption of Oregon UDITPA, have intended such a result? The court thinks not.
Rather, certainly as to assets in respect of which cost recovery deductions are permitted to a purchaser, such an incongruous result is avoided by including in business income any gain on disposition of the asset used in the business. If, on liquidation or otherwise, business assets that have produced for the seller, or will produce for the buyer, cost recovery deductions are sold at a gain, treatment of the gain as business income offsets or balances the prior deductions taken by the seller in computing business income.
To the extent the business asset is sold for more than its basis, as adjusted downward by prior cost recovery deductions, the gain reflects the fact that some portion of the asset was not used up in the seller's business, even though a cost recovery deduction was allowed as though it had been used up. Such a "true-up" is appropriate and indeed is found in the parallel federal tax concept of depreciation recapture. See e.g., IRC § 1245. Further, to the extent the seller who has used an asset in business is able to sell the asset for even more than that seller's original purchase price, that increment of gain is a reflection of an appreciation in the asset while held, maintained, and used in the selling of taxpayer's business. At a minimum, it is an increment of gain that accrued while the asset was held by the seller in its business. These consequences in the case of business assets that could produce deductions, weigh heavily against the treatment of gain as nonbusiness income. *Page 25 
5(b). Additional Consideration — Scope of Tax Statutes
ORS 314.280 and Oregon UDITPA are tools to be employed in a larger context of taxation by Oregon. They cannot extend the fiscal reach of the state beyond federal constitutional limits, but neither should they be read to frustrate the "reach" of overall tax policy of the state by restricting it more than the federal constitution requires — at least absent clear legislative intent to restrict reach.[16] Inspection of our statutes after the adoption of Oregon UDITPA shows no intent to restrict fiscal reach. That Oregon takes a maximum reach is obvious from an inspection of the stated legislative policies with respect to corporate and other taxpayers. The policies on "reach" are explicit. Oregon intends to subject to taxation the entire federal income of taxpayers, only modified as necessary by the state's "jurisdiction to tax." ORS 316.007; ORS 317.018; ORS 318.020.
The statutory reference to jurisdiction to tax can only mean the federal statutory or constitutional limitations applicable to Oregon.[17] The court must assume that if the legislature intended to withhold its full fiscal reach, it would have done so explicitly in the definition of "business income." This it did not do.
5(c). Additional Consideration — Relief From Apparent Conflictof ORS 316.127(3)-(6)
As was discussed in the first order issued in this matter,Crystal I, the individual nonresident shareholders of Crystal, a subchapter S corporation, are considered the taxpayers. The character of their income is determined as if they each realized the item of income from the source from which was realized by Crystal as an S corporation. See ORS 314.734(2). This *Page 26 
statutory mandate requires consideration of rules on source of income for nonresident individuals. ORS 316.127 provides such rules. As to intangible property such as the license, ORS 316.127(3) provides:
 "Income from intangible personal property, including annuities, dividends, interest and gains from the disposition of intangible personal property, constitutes income derived from sources within this state only to the extent that such income is from property employed in a business, trade, profession or occupation carried on in this state."
(Emphasis added). As can be seen, gain on the disposition of intangible property is considered as derived by a nonresident from Oregon sources to the extent the property is employed in a business in Oregon. Id. Applying that test, the gain on the sale of the FCC license would clearly be Oregon source income, and taxable in Oregon, because the license is property employed in a business in Oregon. See id. Indeed, the license neither was nor could have been employed in any other state.
The apportionment and allocation rules, however, also play a role under ORS 316.127. ORS 316.127(6) provides:
 "If a business, trade, profession or occupation is carried on partly within and partly without this state, the determination of net income derived from or connected with sources within this state shall be made by apportionment and allocation under ORS 314.605 to 314.675."[18]
Note that if the provisions of ORS 314.605 to 314.675 (which are Oregon UDITPA), particularly the provision of ORS 314.610, are interpreted as taxpayers urge, a gain from the disposition of an intangible employed in a business carried on in this state would not be *Page 27 
considered, to any extent, Oregon source income, but would rather be allocated to the state of commercial domicile. Accordingly, a contradiction would be created between ORS 316.127(3) and ORS 316.127(6).
D. Conclusion as to Apportionment or Allocation
This contradiction between ORS 316.127(3) and such a reading of ORS 316.610 as incorporated into ORS 316.127(6) can be avoided nicely by simply construing the functional test to the provision in OAR 150-314.610(1)-(B)(2) such that gain from the sale of an intangible asset used in the business is business income. Such a construction is consistent with the fact, discussed at the beginning of this order, that prior to the adoption of Oregon UDITPA, employment of intangible property in Oregon led to taxation, on an apportioned basis, of income or gain from the intangible. This construction comports with the fact that neither the legislature nor the courts have considered the adoption of Oregon UDITPA to have worked major changes in Oregon tax law.
E. Sales Factor Computation
Given the conclusion that the gain from the disposition of the assets of Crystal is business income, that gain is subject to apportionment. To accomplish this, a "sales factor" must be developed. The parties are at odds over the proper sales factor in respect of the sale of the FCC license. For this purpose, a particular rule applies to income from sales of property other than tangible personal property. OAR 150-314.280-(F)[19]; OAR 150-314.665(4).[20] The court sees no *Page 28 
basis for not giving full effect to the rules of the department in this matter.
The parties appear to have requested the court to decide whether gain from the sale of the license is includable in the numerator of an Oregon sales factor. As a preliminary matter, the court concludes that the gain should be included in the numerator and denominator of the Oregon sales factor pursuant to OAR 150-314.665(1)-(A). The business income at issue here can be readily attributed to a particular income-producing activity of the taxpayers. That activity is composed of the "transactions and activity directly engaged in by the taxpayer in the regular course of its trade or business for theultimate purpose of obtaining gains or profit." OAR 150-314.665(4)(2) (emphasis added).
Here, those transactions and activity were the development, operation, and sale of the cellular network in the license area. The record shows activity was engaged in by taxpayers with the ultimate purpose of either obtaining profit from continued operation or gain from disposition of the license. The sale of the license was a step in realization of the ultimate purpose of obtaining an item of income, namely the gain on sale. (Stip Facts at 9-10, ¶¶ 16, 18.)
Taxpayers have suggested that the only activities to be considered in determining the numerator of the Oregon sales factor should be those associated with negotiation and closing of the ultimate asset sale transaction. That is far too narrow a construction of the governing rule. The rule addresses what income-producing activity gave rise to a receipt. See OAR 150-314.665(4)(2). An income-producing activity is defined as transactions and activity having an ultimate purpose of obtaining gain. Id. The focus is obviously broader than the last acts taken to realize gain. In this case, gain was possible if a set of activities were undertaken to initiate and increase cellular phone usage in the licensed area. Had those "transactions and activities" not taken place, there would have been very little gain inherent in the license. Indeed, the pricing of the *Page 29 
license was based on level of customer usage and the extent to which the area served by the license was built out and developed.
Looking at the item of income in question here, the gain from the sale of the license, that gain was produced by a combination of activities. The first element was activity related to building out the network and development of a customer base. The second element was value realization activity, including negotiation for and sale of the license and other assets. The costs of engaging in these activities and the proportion of the income-producing activity occurring in Oregon have not been stipulated and must be determined by further proceedings.
 V. CONCLUSION
Now, therefore,
IT IS ORDERED that Plaintiffs' Motion for Summary Judgment is denied; and
IT IS FURTHER ORDERED that Defendant's Cross-Motion for Summary Judgment is granted; and
IT IS FURTHER ORDERED that this case is continued for further proceedings.
Dated this ___ day of July, 2010.
[1] Defined terms used in this order have the same meaning as in the earlier opinion of the court.
[2] Apportionment and allocation are an issue in this case because, although the taxpayers' business was largely conducted in Oregon, some administrative activities occurred in other states.
Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) are to the 1999 edition.
[3] In State v. Blair, 348 Or 72, 228 P3d 564 (2010), the court, in determining the effect of certain statutory amendments, considered the statutory rules and court construction that had been in place prior to the amendments.Id. at 76, 77-79. In this case, the adoption of Oregon UDITPA came after a series of statutes and agency rules of legislative character. Determining the effect of the adoption of Oregon UDITPA requires an understanding of what went before.
[4] ORS 314.280 was adopted in 1957, Oregon Laws, 1957, chapter 632, section 4, and was enacted in lieu of ORS 316.205 and ORS 317.180 — provisions that applied separately to individuals and corporations but contained provisions parallel to each other and to what became ORS 314.280.
[5] The rules for the period following 1957 and prior to 1965 were designated State Tax Commission Regulation 314.280(1)-(A), State Tax Commission Regulation 314.280(1)-(B), and State Tax Commission Regulation 314.280(1)-(C). Prior to 1963, these regulations were numbered as State Tax Commission Regulation 4.280(1)-(A), State Tax Commission Regulation 4.280(1)-(B), and State Tax Commission Regulation 4.280(1)-(C). Under Springfield EducationAssociation v. School District, 290 Or 217, 621 P2d 547 (1980), there is no doubt these rules were legislative in character.
Hereinafter, the State Tax Commission Regulations are referred to as Regulations, with the citation form of "Reg." The State Tax Commission Regulations can be found at Oregon State Archives.
[6] In Regulation 314.280(1)-(B)(1964), it is clear that the term "income" includes gain from sale or disposition.
[7] Although not specifically stated, exemptions or limitations existed under federal statutes that had the benefit of the Supremacy Clause of Article VI of the United States Constitution. By the time of the adoption of Oregon UDITPA, one example of such limiting federal legislation in force was Public Law 86-272, 73 Stat 555 (1959). No party claims that any federal statutory limitation applies in this case.
[8] Some regulations under ORS 314.280 are specific to particular activities and do not operate by incorporation. See
OAR 150-314.280-(G) to -(L) (1999). Those rules relate to industries not present in this case.
Unless otherwise noted, all references to the Oregon Administrative Rules (OAR) are to the 1999 edition.
[9] Indeed, as discussed below, there is both legislative history and decisional law of the Supreme Court establishing that little was changed by the adoption of Oregon UDITPA, even as to those taxpayers subject to it.
[10] Gain resulting from the condemnation award itself was not an issue in the case as recognition of such gain was deferred as a result of reinvestment of condemnation proceeds. See
IRC § 1033.
[11] By analogy, here, the disposition of the license was as much an integral part of taxpayers' regular business operations as the initial acquisition, management, and use of the FCC license.Compare Simpson, 326 Or at 376-77. Indeed, there is substantial evidence in the record that taxpayers' business plan always contemplated a profitable sale of the license. (Stip Facts at 9-10, ¶ 16.)
[12] These conclusions are also consistent with SH, the earliest case to address these questions and a case discussed inWillamette Industries. See Willamette Industries,331 Or at 317. Further, nothing in Pennzoil teaches otherwise.See 332 Or at 542.
[13] All references to the Internal Revenue Code (IRC) are to 1998.
[14] Those deductions occur under section 197 of the Internal Revenue Code of 1986. Taxpayers here appear to have acquired the FCC license before that statute came into effect. (Stip Facts at 7, ¶ 12.) But for that fact, the FCC license would have been amortizable. IRC § 197(d)(1)(D).
[15] Taxpayers concede income from the use of the license was business income. Stipulated Facts, Exhibit G contains the tax returns of Crystal. All show operating income as apportionable. (See e.g. Ex G-3 at 36.)
[16] ORS 317.010(4), providing for a restricted reach as to taxation of certain export activities, is an example of Oregon staying its financial hand — but it is expressed in statutory form.
[17] The jurisdiction of the state is not limited by its own constitution.
[18] Although there is no separate reference to ORS 314.280 in ORS 316.127, the former statute is brought into play by ORS 314.615. Subsection 5 of ORS 316.127 provides an override with respect to ORS 316.127(3). See ORS 316.127(5). However, that override is intended only to address the shared ownership in an S corporation. Absent the provisions of subsection 5, income of the S corporation that flows through to shareholders could be income from an intangible and therefore not taxed to nonresidents. Subsection 5 prevents this result. It does not neutralize the general policy expressed in subsection 3.
[19] OAR 150-314.280-(F) provides, in relevant part, "[t]he provisions of ORS 314.665 and the rules pertaining thereto, are by this reference incorporated herein and made a part of this [rule]."
[20] OAR 150-314.665(4) provides, in relevant part, "[s]ubsection (4) of ORS 314.665 provides for the inclusion in the numerator of the sales factor of gross receipts from transactions other than sales of tangible personal property * * *."