PENNZOIL COMPANY and SUBSIDIARIES,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 4301)

Trial was held March 10, 11, 12, and December 17, 1999, in the courtroom of the Oregon Tax Court, Salem.

Carol Vogt, LaVine, Davis, Wright, Tremaine, Portland and Paul H. Frankel, Craig Fields, and Hollis L. Hyans, Morrison & Foerster, New York, all argued the cause for Plaintiff (Pennzoil).

Marilyn J. Harbur, Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant (the department).

Decision for Defendant rendered March 17, 2000.

## CARL N. BYERS, Judge.

Pennzoil and its subsidiary corporations (collectively referred to as Pennzoil) appeal from an assessment of additional corporate excise taxes for the 1988 tax year. That assessment arose out of a very large tort settlement received by Pennzoil. Defendant Department of Revenue (the department) contends that the settlement proceeds constitute apportionable unitary business income. The parties stipulated to some facts, and a trial was held to receive evidence with regard to others.

### FACTS

Although Pennzoil is a century-old Pennsylvania oil company name, it is a Delaware corporation with its principal place of business in Texas. During the years in question, Pennzoil constituted a vertically integrated business that explored for, produced, refined, packaged, and sold oil. It also engaged in business activities related to oil, natural gas, and minerals. Its only business activities in Oregon were the distribution and sale of motor oil and related automotive products, and the activities of a small subsidiary. The Oregon subsidiary provided management information services to other Pennzoil operating subsidiaries and sold computer software.

In 1983, Pennzoil's chief executive officer saw an opportunity: Getty Oil Company (Getty Oil), with assets estimated in excess of $10 billion, was experiencing conflict among its major shareholders. Apparently, testamentary

conditions imposed by the late J. Paul Getty were the source of internal discord, resulting in stock values that were far less than asset values. After receiving authorization from Pennzoil's board of directors, on December 28, 1983, Pennzoil made a "friendly" tender offer for 20 percent of the Getty Oil stock. Within days, Pennzoil and Getty Oil reached an understanding and began preparations to formalize their agreement. That understanding contemplated a merger of the two companies and a restructuring of Getty Oil.

Unbeknownst to Pennzoil, Texaco Inc. (Texaco), another large oil company, began secretly negotiating with Getty Oil to buy all of its stock. By January 6, 1984, Texaco had a new agreement with Getty Oil and the two companies merged on February 17, 1984.

Upon learning of the Texaco-Getty Oil agreement, Pennzoil sued Getty Oil for specific performance. When a Delaware court denied Pennzoil that equitable remedy, Pennzoil sued Texaco in Texas for improper interference with a contract. The jury trial awarded Pennzoil a judgment for $11,120,976,110.83 in damages.[1] After Texaco's appeals were denied, it filed bankruptcy. That prompted negotiations between Pennzoil and Texaco, resulting in a settlement agreement. On April 7, 1988, Texaco paid Pennzoil $3 billion in satisfaction of Pennzoil's claims in accord with the settlement agreement.[2] When Pennzoil filed its 1988 Oregon consolidated excise tax return (amended), it treated the net settlement proceeds as nonbusiness, nonapportionable income.[3] The department disagreed with this characterization and assessed additional corporate excise taxes. Pennzoil then commenced this appeal.

---

[1] District Court of Harris County, Texas, judgment entered December 10, 1985.

[2] As of March 31, 1988, in a move apparently intended to avoid state taxation of the settlement proceeds, Pennzoil Company conveyed all of its oil and gas assets to a new subsidiary, thereby converting itself into a holding company. The court considers that action and Pennzoil's holding company status irrelevant to the issues raised by the pleadings.

[3] The parties have stipulated that the amount in dispute is $2,088,840,687.

## ISSUES

Are the tort settlement proceeds unitary business income apportionable to Oregon? If so, should the gross proceeds from financial instruments in which the $3 billion was invested be included in the denominator of the sales factor?

## ANALYSIS

Corporations doing business in Oregon are subject to an excise tax, measured by taxable income. ORS 317.070.[4] Pennzoil Company functioned as an operating company and was the reporting parent in the Oregon combined group. Because Pennzoil engages in business in more than one state, federal constitutional limitations on the state's jurisdiction to tax require its income to be apportioned.

To promote uniform taxation of interstate businesses, Oregon and a number of other states have adopted the Uniform Division of Income for Tax Purposes Act (UDITPA). *See* ORS 314.605 to ORS 314.670. That statutory scheme provides the familiar three-factor formula for apportioning business income.[5] Nonbusiness income is not apportioned by a formula but is allocated based upon the source of the income. The critical question here is whether the tort settlement proceeds constitute business income.

ORS 314.610(1) states, in part:

"* * * 'Business income' means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, the management, use or rental, and the disposition of the property constitute integral parts of the taxpayer's regular trade or business operations."

---

[1] All references to the Oregon Revised Statutes are to the 1987 Replacement Part.

[5] ORS 314.650(1) provides, in part, that:

"* * * All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three."

ORS 314.610(5) states:

> " 'Nonbusiness income' means all income other than business income."

In construing a statute, the court's first duty is to ascertain the intent of the legislature. Normally, this is done by first looking to the text and context of the statute. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). However, UDITPA was adopted with the intent to achieve uniformity in the taxation of interstate businesses. Accordingly, the legislature directs that:

> "(2)   ORS 314.610 to 314.670 shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it." ORS 314.605.

On its face, that statute suggests that the decisions of other states construing UDITPA should be considered by this court.

The Oregon Supreme Court has indicated that the two basic goals of UDITPA are: "(1) fair apportionment of income among the taxing jurisdictions; and (2) uniformity of the application of the statutes." *See Twentieth Century-Fox Film v. Dept. of Rev.*, 299 Or 220, 227, 700 P2d 1035 (1985). Thus, the Oregon Supreme Court has concluded that the legislature intended fairness and uniformity to be the guiding standards.

Oregon is also a member of the Multistate Tax Compact (MTC), a cooperative effort between some states to reduce administrative costs of auditing interstate businesses and to increase uniformity of interstate taxation. *See* ORS 305.655 to ORS 305.685. The MTC has recommended a rule defining business income that Oregon has adopted as OAR 150-314.610(1)-(B). That rule provides, in relevant part:

> "* * * The classification of income by the labels occasionally used, such as manufacturing income, compensation for services, sales income, interest, dividends, rents, royalties, capital gains, operating income, nonoperating income, etc., is of no aid in determining whether income is business or nonbusiness income. Income of any type or class and from any source is business income if it arises from transactions and activity occurring in the regular course of a trade or

business. Accordingly, the critical element in determining whether income is 'business income' or 'nonbusiness income' is the identification of the transactions and activity which are the elements of a particular trade or business. In general, *all transactions and activities of the taxpayer which are dependent upon or contribute to the operations of the taxpayer's economic enterprise as a whole constitute the taxpayer's trade or business* and will be transactions and activity arising in the regular course of, and will constitute integral parts of, a trade or business. * * *" (Emphasis added.)

The validity of that rule was challenged in *Atlantic Richfield Co. v. Dept. of Rev.*, 300 Or 637, 645, 717 P2d 613 (1986). In that case, the Oregon Supreme Court held that the rule would be upheld if: "(1) the application of the formula by the department reasonably approximates the taxpayer's income in Oregon, and (2) the application of the rule by the department 'effectuates [the] general purpose to make uniform the law of those states which enact [UDITPA].' " *Id.* at 645. That broadly worded rule suggests that "fairness" is grounded in the elements of the business and how those elements relate to each other. If the elements are interrelated as part of an integrated or unitary business, the rule would tax all income produced by that business.

Oregon's power to tax is limited by the due process and commerce clauses of the United States Constitution. When imposing an income-based tax on an interstate business, a state may not tax value earned outside its border. *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 US 307, 315, 102 S Ct 3103, 73 L Ed 2d 787 (1982). However, where a single integrated business operates in more than one state, its entire net income may be fairly apportioned among the states in which it operates. *Northwestern States Portland Cement Co. v. Minnesota*, 358 US 450, 79 S Ct 357, 3 L Ed 2d 421 (1959).

"* * * [T]he linchpin of apportionability in the field of state income taxation is the unitary-business principle." *Mobil Oil Corp. v. Commissioner of Taxes*, 445 US 425, 439, 100 S Ct 1223, 63 L Ed 2d 510 (1980).

The unitary business principle provides the "minimal connection" needed to satisfy both due process and the

commerce clause. It is the "rational relationship between income attributable to the state and the interstate values of the enterprise." *Exxon Corp. v. Wisconsin Dept. of Rev.*, 447 US 207, 219-20, 100 S Ct 2109, 65 L Ed 2d 66 (1980). In commenting on this necessary relationship, the US Supreme Court in *Container Corp. v. Franchise Tax Bd.*, 463 US 159, 166, 103 S Ct 2933, 77 L Ed 2d 545 (1983) stated, in part:

> "* * * [T]he principles we have quoted require that the out-of-state activities of the purported 'unitary business' be related in some concrete way to the in-state activities. The functional meaning of this requirement is that there be some sharing or exchange of value not capable of precise identification or measurement beyond the mere flow of funds arising out of a passive investment or a distinct business operation which renders" formula apportionment a reasonable method of taxation."

In that same case the court noted that UDITPA's definitions of business income and nonbusiness income "track in large part the principles we have just discussed." *Id.* at 167. It therefore appears that the fairness required by the United States Constitution is found in the elements of the business, *i.e.*, a unitary relationship. It also appears that applying constitutional standards would achieve some measure of uniformity because every state must comply with the requirements of the United States Constitution.

■     In light of all of the above, the court concludes that the Oregon Legislature intended to tax interstate businesses to the extent allowed by due process and the commerce clause. The legislature has evidenced that intent in regard to other provisions of UDITPA. *See Maytag Corp. v. Dept. of Rev.*, 12 OTR 502 (1993).

That conclusion impacts the court's construction of ORS 314.610(1). Specifically, ORS 314.610(1) has two separate clauses that most jurisdictions view as imposing two separate tests. The first clause adopts a transactional test, *i.e.*, whether income arises from transactions and activities in the regular course of the trade or business. The second clause incorporates a functional test, *i.e.*, income from property is business income if the acquisition, management, use, or rental and disposition of the property constitute an integral

part of the regular trade or business. As indicated, some jurisdictions apply only the transactional test, whereas other jurisdictions apply both tests. *See* I Jerome R. Hellerstein & Walter Hellerstein, *State Taxation*, ¶ 9.05[2] at 9-33 (3rd ed 1998).[6]

■     Although no Oregon court expressly so holds, ORS 314.610(1) has been construed as incorporating both the transactional and functional test. *See Simpson Timber Company v. Dept. of Rev.*, 13 OTR 315 (1995), *aff'd* 326 Or 370, 953 P2d 366 (1998). This court believes the legislature recognized the compelling policy reasons for the functional test and intended it to be used when it adopted ORS 314.610(1).

■■     In applying the transactional test, the first question is: from whence did the income arise? Pennzoil contends that the tort lawsuit was the transaction or activity giving rise to the income. However, Pennzoil ignores a clearly established principle that is found in both federal and state income tax laws. That principle is: amounts received in litigation have the same character for income tax purposes as if collected without the necessity of lawsuit. *Hort v. Commissioner*, 313 US 28, 61 S Ct 303, 85 L Ed 1168 (1941). Certainly a lawsuit to collect money owing on an open account for purchases of goods does not convert the income collected to something other than proceeds from the sale of goods. Likewise, damages received as compensation for loss of profits due to a tort or breach of contract are taxable as ordinary income. *Mertens Law of Federal Income Taxation* § 24A:23.

UDITPA is merely an accounting method for taxing the income of interstate businesses. It does not extend the state's jurisdiction to tax, provide a new form of tax, or change the character of income for taxation purposes. Therefore, it should not be construed to change the character or source of income.

"* * * In determining how damages recovered through litigation or settlement are treated for federal income tax purposes, courts have generally resolved that issue by asking:

---

[6] The authors acknowledge the functional test but do not believe it can be justified based on the language. They state: "[i]n short, despite the compelling policy reasons for adoption of the functional test, we do not believe that the language of UDITPA authorizes it." *Id.* at 9-45.

'In lieu of what were the damages awarded?' " Hellerstein at ¶ 9.13[2][a].

That was the principle applied in *Simpson Timber,* 13 OTR 315, and in *Polaroid Corp. v. Offerman,* 349 NC 290, 507 SE2d 284 (1998), *cert den* 119 S Ct 1576 (1999).

The preponderance of the evidence in this case establishes that the income arose from Pennzoil's agreement with Getty Oil Company (Getty contract). The existence of the Getty contract gave Pennzoil a right to damages for its breach and a right to damages for improper interference. Except for that contract, there would be no recovery and no income.

Initially, Pennzoil sued Getty Oil for specific performance. Failing to obtain that, Pennzoil then sued Texaco for interference of contract. In the Texaco suit, Pennzoil claimed damages for loss of bargain on the Getty contract based on the amount that Pennzoil would have saved in finding and developing one billion barrels of oil reserves. It is the same as if Pennzoil said to Texaco: you stole our deal, pay us what we would have benefitted. In the court's view, it does not matter whether the contract was sold, stolen, condemned, interfered with, or canceled; the income realized from it by Pennzoil was income "arising from" that contract.

The next question under the transactional test is whether negotiation of the contract with Getty Oil Company was an activity or transaction in the regular course of Pennzoil's trade or business. To answer this question, the court must consider what constitutes Pennzoil's regular trade or business.

Pennzoil offered no specific evidence as to how often or what kinds of agreements it negotiates for the sale or acquisition of oil and gas assets. However, some of the evidence touches upon the nature of Pennzoil's business. Pennzoil's offer to purchase the Getty stock stated:

> "* * * Pennzoil is a natural resource company engaged in oil and gas exploration and production, in processing, refining and marketing of oil and gas and refined petroleum products and in mining and processing of copper, molybdenum, silver, gold, sulfur and potash."

Pennzoil's explanation of how it proposed to pay for the Getty Oil stock indicates that most of the funds were to come from a production payment representing the sale of interests in numerous oil and gas leaseholds and fee interests. Also, various activities mentioned in Pennzoil's annual reports are consistent with the activities of a large oil and gas company that regularly engages in transactions and activities to acquire, use, or dispose of oil and gas assets. For example, in its 1984 annual report, the year the Getty contract was entered into, Pennzoil reports that it "participated in a number of major oil and gas plays, both domestically and internationally."

Pennzoil obviously follows the industry practice of acquiring participating interests in various projects or assets and forming partnerships for acquisitions and operations of oil and gas assets. All of those descriptions suggest that acquiring interests in oil and gas properties or in properties having potential for oil and gas is one of the elements of Pennzoil's regular trade or business.

Texaco argues that the contract was to acquire stock, not oil and gas assets. However, it is clear that the plan was to add the Getty Oil reserves to Pennzoil's inventory. Buying the Getty Oil stock was just a less expensive way of obtaining reserves. In the Texaco trial, Hugh J. Liedtke, the chief executive officer of Pennzoil and principal negotiator, testified:

"Now, if * * * if we felt that we would have to own the stock forever, no, we wouldn't pay that for it. But we had, in our agreement, the ability to get assets and that's really what we're after. Principally oil and gas assets."

When asked if the intent was to own the stock, or was it a way to purchase assets, he answered "[w]ell, the answer is we were after assets only. You had to buy some stock first to get there."

Although the Getty contract was large, perhaps the largest ever negotiated by Pennzoil and certainly the richest, the preponderance of the evidence indicates that the transaction was in the course of its regular trade or business. The creation of that valuable asset by the efforts of Pennzoil's officers and employees through negotiation is no different than

the discovery of a new oil field by its engineers or a new method of marketing by its sales staff. Pennzoil regularly acquires, develops, and uses oil and gas assets and that is precisely why it entered into the Getty contract. The court finds that negotiating the Getty contract was an activity in the regular course of Pennzoil's unitary business. Any income arising from that transaction or activity is business income apportionable under UDITPA.

■        Under the functional test, the question is: does the acquisition, management, use or rental, and disposition of intangible property such as the Getty contract constitute an integral part of Pennzoil's regular trade or business? As indicated above, the preponderance of the evidence demonstrates that Pennzoil regularly acquires, uses, and disposes of contracts, stock, partnership interests, leases, and other interests in oil and gas assets. In the Texaco trial, the chief executive officer testified that he negotiated such purchases and sales many times over the years. The officers of Pennzoil spent many years trying to "grow" the company and had previously had joint operations with Getty Oil Company.

As one example, in 1983, Pennzoil, with a group of other "institutional and other investors," formed Proven Properties, Inc., for the purpose of acquiring and operating oil and gas producing properties. During 1984, Proven Properties, Inc. purchased interest in three Gulf of Mexico offshore oil leases and "various interests" in onshore gas producing properties. In the trial in this court, Baine P. Kerr, president of Pennzoil when the Getty contract was negotiated, testified that Pennzoil might have been able to form a joint venture or partnership with Getty. He also indicated that reserves are very important to Pennzoil and that Pennzoil has leases for oil and gas numbering in the thousands.

It is clear that before, during, and after 1984, Pennzoil was actively engaged in acquiring and disposing of interests in oil and gas assets as an integral part of its regular trade or business. It is also clear that the form of those acquisitions, whether stock, partnership interests, or otherwise, is immaterial. The court finds that the Getty contract was intangible property whose acquisition, use, and disposition constituted an integral part of the Pennzoil's regular

trade or business. Except for the size and richness of the prize, it was no different than any number of other transactions over the years.

Applying the functional test, did the income come "from" that intangible property? Again, Pennzoil contends that the settlement income came from a lawsuit for tortuous interference with contract and not from the contract itself. The court acknowledges that a claim for improper interference of contract is different from a claim for breach of contract. The two claims involve different parties, different tests for recovery, and to some extent, different measures of damages. However, the issue is not whether they are different claims. The issue is the source or origin of income. If the income arose from the Getty contract, any actions Pennzoil may have had to take in order to collect that income is irrelevant to its character or nature for income tax purposes.

Despite Pennzoil's arguments to the contrary, the court finds that *Simpson Timber* and *Polaroid* are very relevant. In *Simpson Timber*, the government took the taxpayer's property by power of eminent domain. 13 OTR 315. In *Polaroid*, Kodak infringed Polaroid's patent rights. 349 NC 290. In both cases, property of the taxpayer was taken or appropriated by another party and damages paid in lieu of that property. Those damages were business income. Here, Texaco misappropriated Pennzoil's property. The settlement between Texaco and Pennzoil was in satisfaction of all claims by Pennzoil including its suit for specific performance of its contract.

Pennzoil argues that it only held the Getty contract three days and therefore it could not have been an integral part of its business. However, ORS 314.610(1) contains no time limits. What is particularly important about the Getty contract is that it was not property acquired from outside the business like an oil derrick or piece of refinery equipment that had to be integrated into the unitary operation. Its very creation was a result of Pennzoil's unitary business activities. Consequently, it was inherently an integral part of Pennzoil's regular trade or business.

■ Pennzoil contends that taxation of the settlement proceeds violates the United States Constitution on two separate grounds. First, it contends Oregon has no nexus or minimal connection with the settlement proceeds, therefore it is taxing value earned outside of Oregon. That argument erroneously assumes that the income is not from the Getty contract. Because the income does arise from the Getty contract and that contract was part of Pennzoil's regular trade or business, the unitary business provides the required nexus with Oregon. Pennzoil's oil wells in Louisiana and offshore of California are economically integrated with the packaging and selling of oil in Oregon. Any gains or losses suffered by one part of the unitary business are suffered by the whole.

Pennzoil assumes that its operations in Oregon had no connection with negotiating the Getty contact in New York. Nothing could be further from the truth. Regardless of the negotiating skills of Pennzoil's officers and employees, a contract with Getty Oil was possible only because of Pennzoil's unitary business. Without that business, Pennzoil's negotiators had nothing to offer and nothing to bring to the proposed merger table. It is the very "sharing or exchange of value not capable of precise identification or measurement" that makes Pennzoil's interest in the contract a unitary interest. *Container Corp.*, 463 US at 166. Consequently, no one part of the integrated business and no one location can be identified as nonessential in the negotiating activity that gave rise to the Getty contract. The values, expectations, synergies, markets, and other characteristics of the Oregon operations were mingled with and as involved as any other part of the Pennzoil business.

Pennzoil cites *Allied-Signal v. Director, Tax Div.*, 504 US 768, 112 S Ct 2251, 119 L Ed 2d 533 (1992), as authority for arguing that no unitary relationship exists between Getty Oil and Pennzoil.[7] Again, Pennzoil is looking

---

[7] There is no doubt that if Pennzoil had acquired the Getty stock, there would be a unitary relationship.

"* * * When a corporation invests in a subsidiary that engages in the same line of work as itself, it becomes much more likely that one function of the investment is to make better use—either through economies of scale or through operational integration or sharing of expertise—of the parent's existing business-related resources." *Container Corp.*, 463 US at 178.

beyond the mark. The Getty stock was not acquired, therefore no income arose from that stock. The only things acquired were contract rights and contract obligations under the Getty contract. Therefore, the Getty contract must be the source of income. The only question under *Allied Signal* is whether the Getty contract served an operational function or an investment function.

"* * * That is the relevant unitary business inquiry, one which focuses on the objective characteristics of the asset's use and its relation to the taxpayer and its activities within the taxing State." *Id.* at 785.

Because the Getty contract was created by and arose out of Pennzoil's unitary business, there is no doubt that it served an operational function.

Pennzoil's second constitutional argument is that inclusion of the settlement income results in such distortion that Oregon is effectively taxing value earned outside the state. Pennzoil asserts that the income is out of all proportion to activities that take place in the state. Of course, that argument would apply equally to *every* state in which Pennzoil conducts its business. The $3 billion settlement was such a large amount it would cause distortion in every state based on the "normal" business activities in that state. In essence, Pennzoil believes that the settlement was too big to be taxed.

Pennzoil's energetic arguments are driven primarily by the amount involved. There is no doubt that if Pennzoil had sold the Getty contract to Texaco for $300,000 or even $3 million, it would have been treated as business income without hesitation. The fact that the amount was $3 billion suddenly makes any taxation seem wrong to Pennzoil. However, just because a unitary business suddenly realizes more income than normal does not make it nonunitary. The court can find no basis for separating transactions based on size alone.

Pennzoil's separate accounting purports to show that its operations in Oregon suffered a $1 million loss. Therefore, Pennzoil argues it is entirely wrong to attribute a $11.3 million income to such operations. In trying to gain some perspective on this argument, the court has looked at

the company's revenues and net income for the years 1985 through 1988. They are as follows:

|  | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|
| Gross Revenue | $2,249.3 | $1,921.2 | $1,836.3 | $2,273.9 |
| Net Income | $ 113.2 | $ 45.4 | $ 44.3 | $1,475.4 |

(Expressed in Millions)

From the above figures, it is apparent that Pennzoil's gross income in 1988 was only 24 percent higher than 1987 and almost the same as the gross income in 1985. However, the net total income for the company was 33.3 times greater in 1988 than in 1987, more than a 3,200 percent increase over the prior year. The earnings per share reported in the same exhibits show that the amount per share was 5,300 percent greater. Those increases result in a company-wide "distortion" that, using Pennzoil's logic, cannot be justified by any state in which the company does business. But the fact of the matter is the unitary business received more income than its operations normally produce. Because that income was earned by the whole company, it must be apportioned to every state in which it conducts business. In that light, the 3,200 percent increase in total net income is significantly greater than the 1,877 percent "distortion" Pennzoil calculates for Oregon. Although the net income in 1988 was extraordinary, there is nothing inherently unfair in apportioning it. As noted above, except for the unitary business, there would have been no Getty contract.

Pennzoil argues that even if the settlement proceeds are business income, the court cannot justify attributing $11.3 million income to instate activities that actually operated at a loss. That argument attacks the unitary business principle on two points. First, it assumes that separate accounting is accurate when the very reason for adopting the unitary principle was recognition that it is not. It has long been established that separate accounting on a geographical or transactional basis may not reflect the true economics of an integrated business in any particular jurisdiction.

Second, it assumes that extraordinary transactions can be severed from the unitary business. That assumption

would unravel the unitary principle. If a unitary business operated at a loss overall, but one state could identify an extraordinary single transaction or series of transactions in that state which resulted in a gain, would that state be justified in separately taxing the gain? How large or small must such transactions be to justify separate accounting? If specific transactions were taxed by one or more states, how would this affect the losses apportionable to other states? Those are unanswerable questions whose very asking suggests that this approach is contrary to accepted principles of interstate taxation.

In summary, it is undisputed that Pennzoil is a unitary business involving a flow of value interstate that cannot be precisely measured. It is undisputed that Pennzoil does business in Oregon and therefore its business income is apportionable to Oregon. Finally, it is undisputed that Oregon's three-factor formula fairly reflects the way in which income is earned by Pennzoil. Those undisputed facts lead to an indisputable conclusion: Pennzoil's business income is taxable in part by Oregon.

The court has found that the income in question had its source in the Getty contract and that the Getty contract was created in the regular course of Pennzoil's business. Therefore, the income is business income as defined by ORS 314.610(1) and is apportionable.

The second issue that must be addressed by the court is whether the gross proceeds from the financial instruments involved are includible in the denominator of the sale factor. Pennzoil claims that this issue is controlled by *Sherwin-Williams Co. v. Dept. of Rev.*, 14 OTR 384 (1998), *aff'd* 329 Or 599, 996 P2d 500 (1999). The court agrees.

Judgment will be entered consistent with this Opinion. Costs to neither party.