IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| FIDELITY NATIONAL FINANCIAL, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) | TC-MD 140440D |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, State of Oregon, | ) ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION** |

This Final Decision incorporates without change the court's Decision signed by Presiding Magistrate Jill A. Tanner and entered December 29, 2015. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiff appeals Defendant's Conference Decision Letter and Notice of Deficiency Assessment dated September 10, 2014, for the 2010 and 2011 tax years. A trial was held in the Oregon Tax Courtroom on September 15, 2015, in Salem, Oregon. Dan Eller, attorney, appeared on behalf of Plaintiff. Richard Cox (Cox), Plaintiff's Executive Vice President, Finance, testified on behalf of Plaintiff. Darren Weirnick, Assistant Attorney General, appeared on behalf of Defendant. Bruce Hale (Hale), tax auditor, testified on behalf of Defendant. No exhibits were offered by Plaintiff. Defendant's Exhibits A, C, D, E, F, G, J, K, L-1, L-2, L-3, L-4, L-8, M-1, O-5, P-1, P-2, P-3, P-4, P-5, P-7, P-16, P-17, P-18, P-19, Q, R, T-9, W-4 and Y, and rebuttal exhibit R-1 were received without objection. Defendant's Exhibits M-2, P-13, L-6, P-6 and S-1 through S-6 were received with objection.

/ / /

/ / /

## I. STATEMENT OF FACTS

Cox, who held the position of Plaintiff's Senior Vice President/Chief Tax Officer during the tax years at issue, testified that Plaintiff is the "nation's largest title insurance writer and operator," with operations in "all 50 states." Cox testified that Plaintiff consists of "approximately 300 different legal entities." (*See generally* Def's Ex Q.) Cox explained that Plaintiff has existed since 1985 and that most of the legal entities that Plaintiff oversees have been created or purchased to help manage the company's title insurance business. Cox testified that Plaintiff "do[es] a lot of acquisitions all pertaining to the title insurance business" and that Plaintiff employs a strategy of targeting other title insurance companies or other "real estate type" companies for acquisition in an effort "to grow" Plaintiff's business. Cox testified that the "title insurance business generated $4 billion in revenue" and Plaintiff's investments in other "non-core" businesses generated $2 million net earnings to the bottom line."

Cox testified that as part of Plaintiff's business strategy, Plaintiff disposed of some of its subsidiary businesses at various times. For example, Plaintiff sold its wholly owned subsidiary Fidelity National Capital, Inc. ("Capital") in 2009, resulting in a pre-tax loss of $3.4 million. (Def's Ex K at 1012.) Cox described Capital as being "fully integrated" with Plaintiff's regular operations. Plaintiff's annual report stated that in 2011, Plaintiff sold its flood insurance business for a pre-tax gain of $154.1 million; and at the end of 2011 Plaintiff entered in to an agreement to sell an 85 percent interest in its "at risk" insurance business for $119.5 million, resulting in a pre-tax loss of $15.1 million. (*Id.* at 1011-12.)

Cox testified that "over the years" Plaintiff acquired interests in "about six" companies that were unrelated to the title insurance industry. He testified that one of those companies was Ceridian, in which Plaintiff acquired an interest in 2007. (*See also* Def's Ex Y at 1.) Ceridian

was a "leading provider of human resources, transportation and retail information management services[.]" (Def's Ex Y at 1.) Plaintiff received $12.3 million in management fees in connection with the acquisition. (Def's Ex K at 295.) Cox testified that Plaintiff held an interest in Remy International (Remy), a manufacturer of alternators, starters, and hybrid engines. (*See also id.* at 250-51.) Cox testified that, "at some point" Plaintiff acquired notes in Remy, and when Remy went into bankruptcy, the notes converted into equity ownership. (*See also id.*) Cox described Plaintiff as overseeing Remy's return to profitability by ensuring that that Remy had "proper management."

Plaintiff acquired interest in two companies at issue in this case: Fidelity Sedgwick Holdings, Inc. (Sedgwick) and American Blue Ribbon Holdings, LLC (Blue Ribbon).

A. *Sedgwick*

Cox testified that Plaintiff acquired a 40 percent interest in Sedgwick in 2006. (*See also* Def's Ex M-1 at 2.) Cox testified that Sedgwick's business was providing third-party administration of workers compensation claims. Plaintiff entered into a Management Agreement with Sedgwick. (*See* Def's Ex L-3.) Under the terms of the Management Agreement, Plaintiff agreed to advise Sedgwick on financial "negotiation[s]" and contracts, "strategies for improving operating, marketing and financial performance"; "senior management matters related to the business," and "acquisition opportunities." (*Id.* at 1.) The Management Agreement required Sedgwick to pay Plaintiff an annual management fee of at least $200,000. (*Id.* at 2.) Cox testified that the annual fees paid to Plaintiff between 2006 and 2010 totaled $1.5 million.

Sedgwick's Stockholders Agreement provided that Plaintiff had the right to designate two out of seven directors on Sedgwick's board of directors, to be filled initially by Brent Bickett (Bickett) and William P. Foley, II (Foley). (Def's Ex L-2 at 6.) That agreement also provided

that Foley was appointed as Chairman of Sedgwick's board of directors for a three year term. (Def's Ex L-2 at 7.) Foley and Bickett were members of Sedgwick's Audit Committee and Compensation Committee. (*Id*. at 8.) During the time that Plaintiff held its interest in Sedgwick, Foley and Bickett were also members of Plaintiff's board of directors. (Def's Exs L-1 at 1, L-2 at 2.)

Cox testified that while Plaintiff held an interest in Sedgwick, Sedgwick actively acquired other businesses. Cox testified that he had "limited due diligence involvement" in some of Sedgwick's acquisitions. Cox explained that Plaintiff's strategy was to acquire "other little businesses" to "enhance the revenue for Sedgwick." Plaintiff's board of directors minutes show that regular reports were made to Plaintiff regarding Sedgwick, including Sedgwick's acquisitions of other companies. (*See, e.g.* Def's Exs P-1 at 1, 5, 11; P-3 at 19; P-7 at 3.)

Cox testified that Sedgwick maintained its own books, records, and it did not "co-mingle" its operations with Sedgwick. Cox testified that Sedgwick and Plaintiff did not centralize purchasing, accounting, treasury, or administrative functions, or share operating assets, real property, or customers. Cox testified that Plaintiff's operations in Oregon did not depend on or contribute to its investment in Sedgwick and that Plaintiff did not achieve any business efficiencies though its ownership of Sedgwick.

Cox testified that Plaintiff sold approximately one-fifth of its interest in Sedgwick in 2008. (*See also* Def's Ex P-18 at 4.) Hale testified that Plaintiff reported the sale of Sedgwick stock as business income on its 2008 Oregon tax return. Cox testified that Plaintiff sold its remaining interest in Sedgwick in 2010. (*See also* Def's Exs P-19 at 4; Y at 10.) Plaintiff reported a tax gain ($119,966,052) from the sale of Sedgwick as nonbusiness income on its 2010 Oregon tax return. (Def's Ex F at 28.)

B.     *Blue Ribbon*

During the tax years at issue, Plaintiff through its wholly owned subsidiary, Fidelity National Special Opportunities, Inc., which held a minority ownership interest in Fidelity Newport Holdings, LLC, owned 100 percent of Blue Ribbon.  (*See* Def's Exs Q at 51; P-5 at 1.) Cox testified that Blue Ribbon was a "holding company" that owned family and casual dining restaurants (Baker's Square and Village Inn) and a pie manufacturing business (Legacy Pies).

Cox testified that prior to Plaintiff's subsidiaries' acquisition, Blue Ribbon was in bankruptcy proceedings.  Cox testified that Plaintiff viewed the company as a "great deal," and after the acquisition, Plaintiff installed a new board of directors and a hired a new CEO for Blue Ribbon.  Cox testified that Plaintiff was not a customer of Blue Ribbon, Plaintiff did not "co-mingle" its operations with Blue Ribbon, and Plaintiff did not control Blue Ribbon.  Cox testified that Blue Ribbon had its own officers, located in Denver, Colorado and that Plaintiff had no right to management positions within Blue Ribbon.  Cox testified that Plaintiff's Oregon operations did not depend on or contribute to its investments in Blue Ribbon.  Plaintiff reported its income from Blue Ribbon as nonbusiness income on its 2010 and 2011 Oregon tax returns. (Def's Exs F at 28, G at 3.)

C.     *Audit and Conference Decision*

Defendant audited Plaintiff's 2009, 2010, and 2011 tax returns.  (Compl at 3.) Plaintiff disputed two adjustments made by Defendant: Defendant's reclassification of Plaintiff's tax gains from its 2010 sale of Sedgwick stock as business income and Defendant's reclassification of income received from Blue Ribbon as business income in 2010 and 2011.  (*Id.* at 3-5.) Defendant upheld those adjustments in its Conference Decision Letter, dated September 10, 2010.  (*Id.* at 6.)  Hale testified that on its Florida corporate income tax return Plaintiff reported

the "Sedgwick sale as business income" and there was no "nonbusiness income reported for either [tax] year." (*See* Def's Ex J.) Plaintiff timely appealed to this court. (*See id.* at 1-2.)

## II. ANALYSIS

The issue is whether Plaintiff's gains from the sale of its Sedgwick stock and income attributable to Blue Ribbon are business income or nonbusiness income. Business income is subject to formulary apportionment, as provided by the Uniform Division of Income for Tax Purposes Act (UDIPTA), ORS 314.647 to 314.675. Nonbusiness income is not apportionable, but is allocated based on its source. *See generally*, ORS 314.625 to 314.645.

ORS 314.610(1)[1] defines business income as follows:

" 'Business income' means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, the management, use or rental, and the disposition of the property constitute integral parts of the taxpayer's regular trade or business operations."

ORS 314.610(1) contains two separate tests: the "functional test" and the "transactional test." *See Pennzoil Co. v. Dept. of Rev.* (*Pennzoil*), 332 Or 542, 546-47, 33 P3d 314 (2001); *see also Crystal Communications, Inc. v. Dept. of Rev.* (*Crystal*), 20 OTR 111 (2010). "Under the transactional test, 'business income' is 'income arising from transactions and activity in the regular course of the taxpayer's trade or business.' " *Pennzoil,* 332 Or at 547 (quoting ORS 314.610(1)). The functional test requires that the "acquisition," "management," "use or rental" and "disposition" of property be an "integral part of a taxpayer's regular trade or business operations." *Terrace Tower U.S.A., v. Dept. of Rev.*, 16 OTR-MD 131, 136 (1999) *aff'd sub nom. Dept. of Rev. v. Terrace Tower U.S.A., Inc.* (*Terrace Tower*), 15 OTR 168 (2000). The disposition of an asset that was integral to the taxpayer's business will satisfy the functional test,

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2009.

regardless of whether such disposition was a "regular" occurrence in the business. *Crystal*, 20 OTR at 129.

Income is "business income" if it satisfies either the transactional test or the functional test. *Pennzoil*, 332 Or at 547. Income that satisfies neither test is nonbusiness income. *See* ORS 314.610(5) (" 'Nonbusiness' income means all income other than business income.").

A.     *Constitutional Standard – Unitary Business Principle*

This court has observed that "UDITPA's definitions of business income and nonbusiness income 'track in large part'" the unitary business principle. *Pennzoil Co. v. Dept. of Rev.*, 15 OTR 101, 107 (2000) *aff'd*, *Pennzoil,* 332 Or 542, (quoting *Container Corp. v. Franchise Tax Bd.,* 463 US 159, 166, 103 S Ct 2933, 77 L Ed 2d 545 (1983)). The unitary business principle has been described as the "linchpin of apportionability." *See, e.g*, *Fisher Broadcasting Company & Subsidiaries v. Dept. of Rev.* (*Fisher Broadcasting*), 22 OTR 69, 75 (2015). Under the Due Process and Commerce clauses of the United States Constitution, a state may only tax income earned outside its borders "if there is 'some definite link, some minimum connection, between [the taxing] state and the person, property or transaction it seeks to tax.' " *Pennzoil*, 332 Or at 549 (quoting *Miller Brothers Co. v. Maryland*, 347 US 340, 344-45, 74 S Ct 535, 98 L Ed 744 (1954) (alteration in *Pennzoil*). That connection is provided by the unitary business principle, which permits states "to tax a corporation on an apportionable share of the multistate business carried on in part in the taxing State." *Allied-Signal, Inc. v. Director, Division of Taxation (Allied-Signal),* 504 US 768, 778, 112 S Ct 2251, 119 L Ed 2d 533 (1992). By contrast, out-of-state income "derived from unrelated business activity which constitutes a discrete enterprise" is not subject to apportionment. *Id.* at 773 (internal quotation marks and alteration omitted).

/ / /

A unitary relationship between a parent and its subsidiary is not the only method available for a state to tax income of a multistate entity. Capital transactions that serve an "operational function" in the business can be apportioned, even if those transactions occur outside the taxing state. *See Pennzoil*, 332 Or at 449. For example, if an investment, such as a short term investment to raise working capital, can be shown to be related to the in-state operations of a corporation that income could be taxed by the state. *See Terrace Tower*, 15 OTR at 171. However, transactions that serve an "investment function" are not subject to apportionment. *Allied-Signal*, 504 US at 787. If a transaction generally increases a business' net worth, or was acquired for a business purpose, or if proceeds from the transaction are comingled with general business funds, or held for future use in the business, those facts alone will not support a finding that the transaction serves an "operational function." *See Fisher Broadcasting*, 22 OTR at 76. The court will consider the income at issue keeping in mind the unitary business principle.

B.     *Sedgewick*

1.     *Transactional test*

The transactional test focuses on the specific "transaction or activity" that immediately resulted in the disputed income, rather than the general activities of the taxpayer (or others) that preceded the income producing event. *See Pennzoil*, 332 Or at 547-48. "Under the transactional test, 'business income' is 'income arising from transactions and activity in the regular course of the taxpayer's trade or business.' " *Id.* at 547. The first question under the transactional test is, "[w]hat transaction or activity gave rise to the disputed income?" *Id.* at 547-48 (finding that the "transaction" giving rise to settlement proceeds was the contract underlying the tortuous

/ / /

interference claim, not the activity of the tortfeasor). There is no dispute that Plaintiff's sale of the Sedgwick stock "gave rise to" to the disputed income.

The second question under the transactional test is, did that transaction occur in the regular course of the taxpayer's trade or business? *Id.* at 548. Under this test, the "frequency and regularity" of a given transaction or activity may be considered, although it is not dispositive. *Id.* at 549. Transactions that occur infrequently may still occur in the taxpayer's trade or business if such transactions are "customary in" or "within the scope of" activities in that particular trade or business. Oregon Administrative Rule (OAR) 150-314.610(1)-(A)(4)(b); *see also Pennzoil*, 332 Or at 549. "However, even if a taxpayer frequently or customarily engages in investment activities, if those activities are for the taxpayer's mere financial betterment rather than for the operations of the trade or business, such activities do not satisfy the transactional test." OAR 150-314.610(1)-(A)(4)(b). This court has explained that

> "the 'taxpayer's trade or business' * * * must be one that has a reasonable relationship to the taxing state because of business transacted and property located in the taxing state (recognizing as we must that a given corporation may have several 'business activities' or 'nonbusiness activities,' with some easily separated from others and some inextricably mixed with others)."

*Sperry & Hutchinson Co. v. Dept. of Rev.* (*Sperry*), 5 OTR 301, 310 (1973) *aff'd*, *Sperry & Hutchinson v. Dept. of Rev.,* 270 Or 329, 527 P2d 729 (1974); *see also* OAR 150-314.610(1)- (A)(3)(e) (" 'Trade or business' means the unitary business of the taxpayer, part of which is conducted within Oregon.").

The issue in *Sperry* was whether income the taxpayer (S & H) received as interest from investment securities was apportionable to Oregon. 5 OTR at 302. S & H was in the business of selling promotional trading stamps (also known as "green stamps") to retailers, a business it conducted in 48 states, including Oregon. *Id.* S & H also maintained a considerable investment portfolio. *See id.* at 303. S & H hired an investment expert and created an "office of investment

manager" to manage its investment activities. *Id.* S & H also created an "acquisition department," to identify potential "profitable subsidiaries." *Id.* S & H held short-term securities that were either used to maintain cash flow for S & H's green stamp business or held for use in S & H's other investment and acquisition activity. *See id.* at 304–05. S & H also held long-term securities as an investment. *Id.* at 304. Applying what is now described as the transactional test, the court explained:

> "The relationship of the activity to Oregon's jurisdiction must be patent or be so inextricably 'mixed' with the Oregon activity that it is impossible to allocate specifically the profits earned by the processes conducted within its borders. * * * A corporation may have a number of business activities. If each were clearly segregable, there would be no problems of allocation and apportionment[.] * * * When an activity is not readily segregable and it impinges on two or more states, the formulae of apportionment come into play as to that activity."

*Id.* at 310–11. The court concluded that only the short-term investments used to maintain cash flow were "integrated with the stamp business in which Oregon has a relationship" and subject to Oregon tax. *Id.* at 311, 313. The Oregon Supreme Court affirmed the Oregon Tax Court, concluding that S & H's long-term investments and short-term-investments not used to maintain cash flow were "not apportionable to Oregon because neither the capital invested nor the income derived therefrom are a part of the trading stamp business conducted in this state." *Sperry & Hutchinson v. Dept. of Rev.*, 270 Or 329, 331-32 (1974).

The Oregon Tax Court and Oregon Supreme Court's focus on S & H's activities in Oregon is consistent with the principle that the taxpayers "trade or business" under ORS 314.610(1) is its unitary business, "part of which is" conducted in the taxing state. *See* OAR 150-314.610(1) -(A)(3)(e). In *Pennzoil*, the court concluded that settlement proceeds from a tortuous interference with contract lawsuit were business income because the lawsuit arose out of Pennzoil's attempts to secure oil reserves, an activity conduced in the regular course of Pennzoil's business. 332 Or at 549. The court further concluded that apportionment of the

settlement proceeds was consistent with the unitary business principle because securing oil reserves served an operational function in Pennzoil's Oregon business. *Id.* at 549. The court explained that"[t]he acquisition of oil reserves is related—indeed is vitally important—to [Pennzoil's] continued blending and distribution of motor oil *in Oregon*." *Id.* at 550 (emphasis added).

In this case, for the "transaction" (the Sedgwick sale) to be considered a transaction in the regular course of Plaintiff's business, the sale must have been "inextricably mixed" with the business that Plaintiff conducted in Oregon. Plaintiff describes its business as being "the nation's largest title insurance writer and operator" and argues that buying and selling interests in companies like Sedgwick are not part of that business. (Ptf's Post-Trial Mem at 2, 9.) In Defendant's view, Plaintiff's "regular acquisition, management, and sale of substantial stakes in Sedgwick and other companies is a regular part of [Plaintiff's] business that meets * * * the transactional test." (Def's Post-Trial Brief at 19.) Defendant defines Plaintiff's unitary "trade or business:" the "offering of title and specialty insurance products as [Plaintiff's] primary activity, but also, as a secondary activity, the active acquisition, management, and sale of other companies." (*Id.* at 19.) Defendant explained that "[s]ince the business is [Plaintiff's] business and that business included the secondary activity here, the requisite constitutional connection to [Plaintiff's] unitary business exists." (*Id.* at 21.)

The parties agree that Sedgwick's third-party claims administration operations and Plaintiff's title insurance operations were not part of the same unitary business. (*See* Def's Post-Trial Brief at 11.) The parties also agree that the Plaintiff bought, and at times sold, interests in other businesses. Cox testified that Plaintiff engaged in "a lot" of acquisitions of other complimentary businesses as part of a strategy aimed at growing Plaintiff's title insurance

business. Defendant's evidence supports Cox's testimony that the majority of Plaintiff's acquisitions were aimed at growing its title insurance and related businesses. The testimony and evidence show that Plaintiff acquired interests in other companies that were not integrated with its title insurance business. Plaintiff viewed those companies, such as Ceridian, Remy, Blue Ribbon, and Sedgwick, as "investments." With respect to Sedgwick, Cox testified that Plaintiff's senior officers, such as Bickett, were involved in Plaintiff's acquisition and management of Sedgwick, and helped grow Sedgwick through the acquisition of other companies to "enhance the revenue for Sedgwick." Cox's testimony shows that Plaintiff employed a similar strategy with Sedgwick—acquiring other complimentary businesses as a means for achieving growth—as it did in growing its title insurance business. Plaintiff's title insurance business can be readily separated from activities overseeing its interest in those "non-core" subsidiaries.

Plaintiff's investment activities are similar to those undertaken by the taxpayer in *Sperry*. S & H's "office of investment manager" invested in short-term securities to manage cash flow for S & H's green stamp business, but also used short-term securities to further S & H's acquisition and long-term investment activity. *Sperry*, 5 OTR 304–05. In that case, the court concluded that only the securities used to manage cash flow for the green stamp business generated "business income" because only those investments were "integrated with [the] stamp business" in which Oregon has a relationship. *Id.* at 313. Income from S & H's other short-term investments did not generate "business income" merely because the same employees used similar investment strategies and assets. This court concluded that a connection to the activity conducted in Oregon was required for that income to be subject to Oregon tax. This court explained in a subsequent case:

> "Corporations may conduct one or more separate businesses. All, some, or none of those businesses may be conducted interstate and may be unitary with another. Both unitary property taxation and unitary income taxation distinguish between the corporation and the businesses it conducts. In the case of a tax on an activity, such as an income tax, 'there must be a connection to the activity itself, rather than a connection only to the actor the State seeks to tax.' * * * For investments to be related to the activity, in the language of the United States Supreme Court, they must serve an 'operational function.' "

*Terrace Tower*, 15 OTR at 172-73 (quoting *Miller Brothers Co.*, 347 US at 778). With respect to investments, this court explained that to

> "serve an 'operational function' there must be a flow of value between the investment and the activities sought to be taxed. When a corporation makes a 'passive' investment, there is a flow of value to the corporation, the actor, but not to the unitary business activities that it conducts."

*Id.* at 173.

In this case before the court, the connection between the Sedgwick sale and the business that Plaintiff conducted in Oregon is absent. The acquisition and sale of Sedgwick was not so "inextricably mixed" with Plaintiff's title insurance business that it would be impossible to segregate the Sedgwick gain from the revenues generated by Plaintiff's Oregon activity. Plaintiff's partial ownership interest in Sedgwick was closer to a passive "investment" rather than serving an "operational" function. Cox's testimony stated that Plaintiff's operations in Oregon did not depend on or contribute to its interest in Sedgwick. There was no contrary evidence presented. Even though Plaintiff expended substantial effort to grow Sedgwick prior to selling Sedgwick at a substantial gain, those activities were not integrated with Plaintiff's title insurance business. Defendant provided no evidence of a connection between Oregon and Plaintiff's corporate acquisition business. Plaintiff's activities managing and selling Sedgwick were discreet business activities, unrelated to the business Plaintiff conducted in Oregon. The sale of Sedgwick was not a transaction in the regular course of the unitary business Plaintiff partially conducts in Oregon and does not satisfy the transactional test.

2.    *Functional Test.*

In its Post-Trial Brief, Defendant acknowledged that if the court were to conclude that the Sedgwick gain was not business income under the transactional test then the "Sedgwick Gain would not otherwise meet the functional test for business income." (Def's Post-Trial Brief at 21–22 n 15.) Having concluded that the Sedgwick gain does not meet the transactional test, the parties are in agreement that the Sedgwick gain is not business income under the functional test. Because the Sedgwick gain does not satisfy either test, that income is not business income and is not subject to apportionment.

C.    *Blue Ribbon*

The parties' positions with respect to Plaintiff's income from Blue Ribbon are substantially the same as their positions with respect to Sedgwick. Plaintiff characterizes its interest in Blue Ribbon, which it held through partially and wholly owned subsidiaries, as a "special opportunity" that was unrelated to its title insurance business. (Ptf's Post-Trial Mem at 10.) Defendant argues that Plaintiff's "income from its restaurant interests was income from transactions and activity in the regular course of [Plaintiff's] secondary business activity of buying, managing, and selling interests in other companies." (Def's Post-Trial Brief at 24.)

Plaintiff's "trade or business" that it conducts in Oregon is its title insurance business. In order to generate business income, Plaintiff's interest in Blue Ribbon must have been so "inextricably mixed" with that business as to make apportionment appropriate. It is not enough to say that Plaintiff regularly bought, managed, and sold other businesses as a secondary business activity; that secondary activity must have been integrated with the activity that Plaintiff carries on in Oregon. The court is not persuaded that Plaintiff's "management" of Blue Ribbon was in any way related to the title insurance business that it conducted in Oregon. The court concludes

that income from Plaintiff's interest in Blue Ribbon was not business income and not subject to apportionment for the tax years at issue.

### III. CONCLUSION

After careful review of the testimony and evidence, the court concludes that Plaintiff properly reported gains from the sale of its Sedgwick stock as nonbusiness income on its 2010 Oregon tax return. The court further concludes that Plaintiff properly reported income from Blue Ribbon as nonbusiness income on its 2010 and 2011 Oregon tax returns. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted.

IT IS FURTHER THE DECISION OF THIS COURT that Plaintiff properly reported income from Fidelity Sedgwick Holdings, Inc. and American Blue Ribbon Holdings, LLC as nonbusiness income on its 2010 and 2011 Oregon tax returns.

Dated this ____ day of January 2016.


RICHARD DAVIS
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on January 15, 2016.*